UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

                                           :

SNOWTREE ENTERPRISES, LLC,       :

                                           :

      Plaintiff,                     :

                                         :

v.                                     :      Civil Action No. 05-10341

                                       :

SLENDER LADY, INC.,              :

                                         :

      Defendant.                :

_____:

## SLENDER LADY, INC.'S MOTION FOR LEAVE OF COURT TO FILE REPLY BRIEF

In accordance with Local Rule 7.1(B)(3), Defendant Slender Lady, Inc. ("SLI") hereby moves the court to grant it leave, so that it may file a reply brief in support of its Motion to Dismiss and in response to the opposition papers filed by Plaintiff Snowtree Enterprises, LLC ("Snowtree").  A reply brief is necessary to respond to certain statements and allegations contained in Snowtree's opposition papers, and to clarify certain issues surrounding SLI's Motion to Dismiss.  SLI's Reply Brief is being filed herewith.

In accordance with Local Rule 7.1(A)(2), counsel for SLI certified that the parties have conferred regarding this Motion for Leave.  Snowtree's counsel has consented to SLI's filing of a reply brief.

WHEREFORE, SLI requests that the Court grant it leave to a reply brief in support of its Motion to Dismiss.

SLENDER LADY, INC., by its attorneys,


/s/ Jason W. Morgan
Jason W. Morgan (BBO #633802)
jmorgan@dhtmlaw.com
Michael D. Williams (BBO #654149)
mwilliams@dhtmlaw.com
Drohan, Hughes, Tocchio & Morgan, P.C.
175 Derby Street, Suite 30
Hingham, MA  02043
Tel.:  (781) 749-7200
Fax:  (781) 740-4335

Dated: April 15, 2005


## CERTIFICATE OF SERVICE

I, Michael D. Williams, hereby certify that on April 15, 2005, I served a true and correct copy of the foregoing by overnight delivery upon counsel for Plaintiff, Louis M. Ciavarra, Bowditch & Dewey, LLP, 311 Main Street, Worcester, Massachusetts 01601.


/s/ Michael D. Williams

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————————
:
SNOWTREE ENTERPRISES, LLC,                    :
                                              :
         Plaintiff,                           :
                                              :
v.                                            :        Civil Action No. 05-10341
                                              :
SLENDER LADY, INC.,                           :
                                              :
         Defendant.                           :
—————————————————————————:

## REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Defendant Slender Lady, Inc. ("SLI") hereby files this Reply Brief in support of its
Motion to Dismiss, and in response to the opposition papers filed by Plaintiff Snowtree
Enterprises, LLC ("Snowtree").

### I.      Snowtree's assertion that SLI has waived its right to arbitration is baseless and inaccurate.

Snowtree's prime theory of opposition against SLI is based on the notion that SLI
somehow waived its right to arbitration by allegedly not agreeing to a face-to-face meeting with
Snowtree when a dispute arose between the two parties.  To assess the legitimacy of this claim,
this Court has to look no further than the October 1, 2004 letter (the "Letter," attached as **Exhibit
A**) that Snowtree references in its opposition papers.[1]  Snowtree has asserted in its opposition
papers that the Letter "requested in clear, unambiguous language that Slender Lady contact
[Snowtree's] Mr. Bladon or his attorneys by late-October 2004.  Mr. Bladon's letter, therefore,
served as a formal request from Snowtree to Slender Lady for the 'meeting' described more fully
in the Agreement as a 'face-to-face meeting.'"  The Letter makes no such formal request.  See

---

[1] In Snowtree's opposition papers, the Letter is incorrectly described as being authored on October 4, 2004.
Snowtree failed to attach a copy of the Letter to its opposition papers.

**Exhibit A**.  In fact, the Letter requests only that the parties have a teleconference to discuss their

dispute:

> We would like to discuss ending our relationship amicably.  This is in
> keeping with the spirit of the agreement.  Should you wish to discuss
> this alternative, we need to hear from you by October 22, 2004 to
> schedule a conference call.

Id.

On its face, the relevant text from the Letter falls far short of being a written request for a

face-to-face meeting.  Instead of requesting a face-to-face meeting, Snowtree's Bladon mentions

"ending" the "relationship" between SLI and Snowtree, describes such an "ending" as an

"alternative," and then creates a deadline for SLI to "discuss" the "alternative" by scheduling "a

conference call."  **Exhibit A**.

Even assuming, arguendo, that Snowtree had requested a face-to-face meeting (and it did

not), and even if SLI then ignored the request, the occurrence of a face-to-face meeting is in no

way a "condition precedent" to arbitration as Snowtree erroneously asserts[2].

The Agreement is clear that a face-to-face meeting is not a "condition precedent" for the

parties to arbitrate their disputes under the Agreement.  A face-to-face meeting is indeed

described as the first step in the dispute avoidance process, but the next step – mediation – is to

be undertaken if the fist step is unsuccessful.  As Snowtree has yet to even request a face-to-face

meeting in writing, it has not yet even attempted to engage in the first step of the dispute

avoidance process.  Therefore, Snowtree's own theory of waiver is defeated by its own failure to

submit a written notice to SLI requesting a face-to-face meeting.

Also, Snowtree's argument that SLI somehow waived its right to arbitration by

successfully removing the instant action from state court to this Court is pure legal fiction, as the

---

[2] Snowtree's statement in its opposition papers that a face-to-face meeting is a "condition precedent" to arbitration is
not supported by any factual citation.  That is because there are no facts to support that bald assertion.

removal was merely a function of seeking out the proper venue to hear SLI's Motion to Dismiss. The fact that SLI successfully removed this action to this Court in no way precludes SLI's ability to contest the legitimacy of this suit and to compel arbitration in accordance with the Agreement. The removal does not, and cannot, have any effect on Snowtree's complete disregard for the arbitration provision in the Agreement.  Further, it is telling that Snowtree offers absolutely no legal authority in support of its proposition that SLI has waived its right to arbitrate by removing this action from state to federal court.  That is, of course, because there is none.

**II.    The dispute avoidance provisions in the Agreement are fully enforceable against Snowtree.**

Snowtree's rambling and contrived argument that the dispute avoidance provisions in the Agreement are somehow unenforceable completely ignores the facts of the instant action.  This Court need only review a complete copy of the Agreement to understand that the Agreement was aggressively renegotiated, being revised and altered by Snowtree itself (as demonstrated by the many hand-written changes).   The Agreement, including the arbitration provision, was thus reached in a fair and "arms-length" process.

A review of the Agreement as a whole (it is attached hereto, in its entirety, as **Exhibit B**) reveals dozens of hand-written revisions to the Agreement, many of them apparently initialed and written by Snowtree's President, John Bladon.  In fact, the Agreement contains an entire hand-written addendum, entitled "Territory Agreement V4," that appears to be drafted by John Bladon and is executed by both parties.  Id.  A review of the Agreement also reveals several sentences, paragraphs, and entire sections that have been stricken from the original document. Id.  Further, Article 20 of the Agreement, which encompasses the arbitration provision, contains numerous hand-written additions and deletions, presumably negotiated by Mr. Bladon or another representative of Snowtree.  See id. at pp. 41, 43, and 45.

Further, Snowtree's attempt to characterize the Agreement's fee deposit requirement or forum selection clauses as being unconscionable borders on the ridiculous, considering that Snowtree had ample opportunity and ability to revise these clauses to its liking, as demonstrated by the many revisions and deletions evidenced throughout the entire Agreement.  See **Exhibit B**. Therefore, due to Snowtree's detailed involvement in the negotiation of the Agreement, not to mention its status as a sophisticated business entity, the Agreement cannot be considered an "adhesion contract" or a "standard-form contract" that is somehow unenforceable.

Also, the Supreme Court opinion that Snowtree cites in an attempt to support its contention that the $10,000 fee deposit requirement in the Agreement creates a "prohibitive cost," Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000), is not helpful to its position whatsoever.  Although the Supreme Court in Green Tree does generally state that prohibitive costs could theoretically invalidate an arbitration agreement, the Court in Green Tree actually focused on the appellant's contention that an arbitration provision, that did not specify costs, would eventually result in prohibitive costs for her if she arbitrated her dispute.  Id. at 90. Contrary to Snowtree's inference, the Green Tree opinion does not hold that $10,000, or any other specific amount, qualifies as a prohibitive cost.  Further, the Supreme Court holds in Green Tree that "where . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  Id. at 92.  Snowtree has not made a demonstration that carries this burden.  Therefore, in the same manner that it attempts completely distort the meaning of the Letter and the Agreement, Snowtree has attempted to improperly exaggerate the holding of the Green Tree opinion to serve its own interests.

**III.    Snowtree's contention that the Agreement's dispute avoidance provisions do not apply to "start-up essentials" has no basis in fact or law, and thus must fail.**

In its opposition papers, Snowtree argues that the dispute avoidance provisions contained in the Agreement do not apply to what it terms as "start-up essentials."  To support its position, Snowtree cites to Paragraph 20.1 of the Agreement.  <u>See</u> **Exhibit B**.  However, apart from Snowtree's very creative interpretation of that paragraph of the Agreement, there is not a single term contained therein that limits the Agreement's dispute avoidance provisions from applying to "start-up essentials" or any other scenario.  Further, Snowtree fails to even define what the term "start-up essentials" means within the context of its own Opposition, never mind that the term "start-up essentials" is not defined in the Agreement.  <u>See</u> <u>id</u>.

A more broad review of the Agreement, focused in particular on the beginning of the Agreement, reveals that the Agreement makes it clear that all of the terms of the Agreement apply from the date of the execution of the Agreement forward.  <u>See</u> **Exhibit B**.  Article 2 of the Agreement addresses the award of an SLI franchise, and Article 4 actually addresses, in much detail, the "start-up" phase of a franchised location.  <u>See</u> <u>id</u> at pp. 3-5, 7-10.  Ironically, Paragraph 4.1 of the Agreement provides as follows, in the case of an unsuccessful attempt to open an SLI franchise location:

> If you are unable to complete any of such obligations within such periods, we may (but have not obligation to) at any time thereafter terminate our obligations and your rights under this Agreement, provided we refund to you the lesser of (a) one-half (1/2) of the initial franchise fee paid to us pursuant to this Agreement or (b) the initial franchisee fee less all expenses (including legal fees, commissions, training costs, etc.) incurred in connection with such franchising and termination; and you will concurrently execute documents acceptable to us, providing for (1) continuation of your indemnification, confidentiality and non-competition obligations **and the dispute avoidance and resolution provisions of this Agreement**, including those of Article 15 and **Article 20** . . .

Id. at pp. 7-8 (emphasis added).  Clearly, based on this quoted text, the Agreement specifically provides for the application of the Article 20 dispute avoidance provisions even when a franchisee fails in its attempt to "start-up" an SLI franchise location.  Id. at ¶ 4.1.  Further, Articles 5 and 6 of the Agreement also address "start-up" specifics such as training and franchise location image.  Id at pp. 10-16.

With absolutely no support either in the Agreement or in law, Snowtree's contention that the dispute avoidance provisions of the Agreement do not apply to what it terms as "start-up essentials" is pure makeweight.  By the terms of the Agreement, this contention is flatly rebutted. See **Exhibit B**.

## IV.    Conclusion.

For the foregoing reasons, as for the reasons stated in SLI's Motion to Dismiss, this Court should grant SLI's Motion to Dismiss and compel Snowtree to submit its claims to arbitration.

SLENDER LADY, INC.,
By its Counsel,


Dated: April 15, 2005                    /s/ Jason W. Morgan
                                         Jason W. Morgan (BBO #633802)
                                         jmorgan@dhtmlaw.com
                                         Michael D. Williams (BBO #654149)
                                         mwilliams@dhtmlaw.com
                                         Drohan, Hughes, Tocchio & Morgan, P.C.
                                         175 Derby Street, Suite 30
                                         Hingham, MA  02043
                                         Tel.:  (781) 749-7200
                                         Fax:  (781) 740-4335

## <u>CERTIFICATE OF SERVICE</u>

     I, Michael D. Williams, hereby certify that on April 15, 2005, I served a true and correct copy of the foregoing by overnight delivery upon counsel for Plaintiff, Louis M. Ciavarra, Bowditch & Dewey, LLP, 311 Main Street, Worcester, Massachusetts 01601.


                            /s/ Michael D. Williams

EXHIBIT A



October 1, 2004

Mr. Bruce Sharpe
President
Slender Lady Inc.
45 N.E. Loop 410
Suite 500
San Antonio, TX 78216

Dear Mr. Sharpe:

As you know from our discussions, our Slender Lady franchises have continued to show unsustainable losses since beginning operations in January, 2004. We understand fully our responsibilities to make a venture successful. However, the other part of the equation is your responsibility to provide foundation steps from which our efforts can build. These steps are well documented on your web site, your marketing material and our franchise agreement.

After a careful analysis of the matter, we have concluded that you have breached your agreement with us, both in spirit and in substance. Your actions, and lack of actions, created a pattern that contributed heavily to our failure. This has happened despite our best efforts to succeed, our adherence to the franchise agreement and our following of your advice. In particular, the following has occurred:

- **We did not receive our exercise equipment, marketing materials and operational manuals for our Sudbury site until two weeks after our grand opening, even though we asked you for these multiple times prior to our opening.** Some of these materials we had to create on our own at great expense. This had a very detrimental effect on us from the start; the grand opening is the premier event in starting any business. The lack of the material and equipment cited caused us to give a very bad impression to our potential customers. Many did not join and others walked away thinking we were not a legitimate business. We never overcame this bad start. Given the closeness of this community, the word spread quickly, causing us irreparable damage, as evidenced by the fact we have only 38 members after 8 months of operation. This is only 20% of the clientele needed to break even, much less make a profit.
- **From January, 2004 to June, 2004 your company experienced significant internal turmoil, when your Chief Operating Officer and President, Mr. Robert Morgan, left the company and a management struggle ensued.** This included your taking a very different and much larger role; many key

people leaving the company; and significant organizational changes. While this was going on, you and your associates were non-responsive to pleas for help from our Slender Lady point person, Maggie Tyler, and her assigned personnel. Specifically, you

- o Never replied to our e-mails citing problems and asking for help.
- o Did not answer or return phone calls on marketing and operational questions despite multiple tries on our part. As a result, we struggled with operating, employee, cost control and customer-related issues and problems. Our ability to recruit new members slowed to a trickle and our costs soared. An example of this is our overstaffing by double due to your guideline to have at least one person on the circuit and one person behind the counter at all times. Overall during the period our losses per month ranged from $15,000 to $25,000. At present, we are still losing $15,000 per month for both locations combined.
- o Did not provide customer related documentation and material such as marketing flyers, coupons, and other advertising material as well as updates to procedures manuals. Our only recourse was to plan, design and produce this material on our own. This was slow, very costly and inefficient, and hurt our chances to gain new members at both our locations.
- o Had significant turnover in key positions, such as Bob Rieser, Executive Vice President; Joe Verdugo, Vice President - Compliance; Dr. John Verdugo, Chief Executive Officer; and Robert Morgan, President.

- **During the above described period, you changed the positioning of a Slender Lady franchise from weight loss center to discount exercise studio then back to premium weight loss studio, all within a six months period**. This was no mere change in tactics; it was a fundamental change in strategy affecting pricing, employee qualifications, target customers and marketing. These changes in strategy caused great confusion among our potential customers, our existing customers and our employees. It also resulted in additional marketing expenses. In general, we had to adjust staffing and we had to recast our pricing model. We have still not recovered from this whip-saw effect. You told us you had a winning formula that could result in 300 to 500 members or more, and we trusted you. This is why we agreed to be a franchisee in the first place. Without an overarching, stable business philosophy, we would have never considered purchasing even a single franchise license, much less the number we did buy. This is precisely why and only why people buy franchises in the first place.
- **We were promised a national ad campaign, including but not limited to a national television commercial. That has still not occurred**. We have no name recognition in Massachusetts, and are at the mercy of Curves tm, which you told us was our biggest competitor and against which you had told us to go against head-to-head. (Curves tm has over 80 studios in the greater Boston area.) Obviously, this strategy failed miserably.

- **We did not receive an updated Nutrition Guide until months after promised.** The original manual was so full of errors that entire pages had to be removed per your instruction. The problems with the original manual and the lack of an updated manual severely hampered our efforts to get members for our nutrition program, which is a critical element of the overall Slender Lady product/service set and a key to our success.
- **In breach of our location agreement, you entered into an agreement with a franchisee to place a Slender Lady in Natick, Massachusetts.** Our territory is "generally considered to be Massachusetts east of I-495 and exclusionary areas as noted and specifically Framingham, Mass." Natick is in our territory and is <u>not</u> the same as Framingham, which is a totally different town and jurisdiction. You publicly announced this Natick franchise on your web site, where it still resides. We have since had potential customers tell us that they intended to join the Natick location versus our locations only because Natick was somewhat closer. This obviously took away any choice we had in the matter, as agreed, and pushed potential customers away.
- **We have tried to sell our Sudbury location since September, 2004 for as little as $15,000 with no offers forthcoming.** In fact, your staff has led the sales effort, writing the ad and fielding all calls. This attests to the lack of value the market places on Slender Lady, despite all our efforts to make our franchises succeed.

In the course of our involvement with Slender Lady Inc., we have incurred capital costs and expenses to date related to our Slender Lady franchises totaling over $360,000:

- Franchise fees and deposits of $124,600
- Equipment and furniture costs of $17,846
- Leasehold improvements of $57,393
- Operating losses of $168,824

While we were experiencing these difficulties, we understand that the N. Attleboro site has suffered similar problems as we. Moreover, we have had many discussions with other franchisees **across the country** that started on or around the same time as us and have had a similar experience. Our new customer growth has been minimal with currently 38 active members in Sudbury and 55 active members in Walpole. We have estimated that we need at least 180 or more full-cost members to break even, not to mention earning a reasonable return of investment. Even if we were able to quicken our pace of enrollment two or three-fold, we would still not break-even after another 8 months of losses.

The franchise argument requires us to "at all times faithfully, honestly and diligently perform your obligations ... and continuously exert your best efforts to promote, enhance and maximize the business ...." To this end we had on staff a certified nutritionist, a part-time medical doctor, a professional body builder, and the student in her training class at Slender Lady University that gave the best sales presentation (per Mr. Morgan). We have done this and more to the extent of 110%--**the problem is not us, it is Slender Lady.** Slender Lady was a new franchise product to Massachusetts when you sold us our licensee and it is clear to me that you were not ready to make the commitment needed for

the success of our franchises. We believed you had a proven business to sell us, and, at least in Massachusetts and arguably other states, you clearly did not.

We would like to discuss ending our relationship amicably. This is in keeping with the spirit of our agreement. Should you wish to discuss this alternative, we need to hear from you by October 22, 2004 to schedule a conference call. We have been advised by our attorneys that the failures by Slender Lady are so basic and substantial as to negate the validity of the remedy limitation provisions of the franchise agreement and are therefore actionable in Massachusetts. We hope to hear from you. If you do not contact us, we will have to proceed on our own to an appropriate next step.

Very truly yours,

John Bladon
President

EXHIBIT B
(PART 1 OF 3)

# Slender Lady

# Lifestyle

# Franchise Agreement

# SLENDER LADY, INC.

## FRANCHISE AGREEMENT

_SNOWTREE ENTERPRISES LLC_
Franchisee

_____

_____
Location                    :

_____
Date of Agreement

# TABLE OF CONTENTS

**Section**

**Page**

1. INTRODUCTION, DEFINITIONS, AND PRELIMINARY AGREEMENTS ................................... 1
   1.1 Introduction........................................................................................... 1
   1.2 Definitions ............................................................................................. 1

2. AWARD OF FRANCHISE ............................................................................................ 3
   2.1 Award of Franchise; Term, Your Basic Commitment................................ 3
   2.2 Territory................................................................................................. 3

3. SUCCESSOR FRANCHISE......................................................................................... 5
   3.1 Regular Successor Franchises...............................................................5
   3.2 Your Obligations ...................................................................................5

4. DEVELOPMENT AND OPENING OF YOUR SLENDER LADY CENTER ........................... 7
   4.1 Site Selection - Development ..................................................................7
   4.2 Lease of Premises.................................................................................9
   4.3 Slender Lady Design Standards...........................................................10
   4.4 Equipment, Furniture, Fixtures and Signs ............................................10
   4.5 Slender Lady Center Opening...............................................................10
   4.6 Relocation of Slender Lady Center Premises........................................10

5. TRAINING AND GUIDANCE .....................................................................................11
   5.1 Initial Training .....................................................................................11
   5.2 Manuals...............................................................................................11
   5.3 Additional Training...............................................................................12

6. YOUR SLENDER LADY CENTER — IMAGE AND OPERATION...................................12
   6.1 Condition and Appearance of Your Slender Lady Center, Regular Upgrading ...............12
   6.2 Slender Lady Systems..........................................................................13
   6.3 Designated Equipment, Products and/or Suppliers................................13
   6.4 Specifications, Standards and Operating Procedures............................14
   6.5 Compliance with Laws and Ethical Business Practices..........................14
   6.6 Management and Personnel of Your Slender Lady Center, Training ...........14
   6.7 Insurance.............................................................................................15
   6.8 Continued Payment of Monthly Service Fees and Other Obligations
       During Closure, etc. .............................................................................15

7. AGREEMENT NOT TO COMPETE, CONFIDENTIALITY, ETC. .....................................16
   7.1 Exclusive Relationship, Restrictions on Similar Businesses During Franchise Term
       and After Transfer, Termination, Expiration, Repurchase, etc. .........................16
   7.2 Confidential Information - Non-Disclosure and Non-Use .......................18

8. INITIAL FRANCHISE, MONTHLY SERVICE, MARKETING FUND FEES ..........................19
   8.1 Initial Franchise Fee .............................................................................19
   8.2 Monthly Royalty Fee.............................................................................20
   8.3 Marketing Fund - Local Center Advertising ..........................................20

|       |      |                                                                                              |      |
|-------|------|----------------------------------------------------------------------------------------------|------|
|       | 8.4  | Electronic Funds Transfer                                                                     | 22   |
|       | 8.5  | Inflation Adjustments                                                                         | 22   |

**Section**

**Page**

| 9.    |      | LATE PAYMENTS AND REMEDIES                                                                    | 22   |
|-------|------|----------------------------------------------------------------------------------------------|------|
| 10.   |      | RECORDS AND FINANCIAL INSPECTION.                                                             | 23   |
|       | 10.1 | Records                                                                                       | 23   |
|       | 10.2 | Franchisor's Inspection, etc.                                                                 | 23   |
| 11.   |      | OPERATIONS PROCEDURE                                                                          | 23   |
|       | 11.1 | Facilities.                                                                                   | 23   |
|       | 11.2 | Office Supplies                                                                               | 24   |
|       | 11.3 | Advertising                                                                                   | 24   |
|       | 11.4 | Initial Advertising/Marketing                                                                 | 24   |
| 12.   |      | MARKS                                                                                         | 24   |
|       | 12.1 | Goodwill and Ownership of Marks                                                               | 24   |
|       | 12.2 | Limitation and Use of Marks                                                                   | 24   |
|       | 12.3 | Notification of Infringements and Claims                                                      | 25   |
|       | 12.4 | Discontinuance of Use of Marks                                                                | 25   |
| 13.   |      | TERMINATION OF THE FRANCHISE                                                                  | 25   |
|       | 13.1 | Defaults with No Right to Cure                                                                | 25   |
|       | 13.2 | Defaults with Right to Cure                                                                   | 26   |
|       | 13.3 | Repeated Defaults                                                                             | 27   |
|       | 13.4 | Cross-Defaults, Non-Exclusive Remedies, etc.                                                  | 27   |
|       | 13.5 | Our Right to Discontinue Providing Products to You After Issuance of Notice of Default.       | 27   |
| 14.   |      | PROCEDURES UPON TERMINATION, TRANSFER, REPURCHASE AND/OR EXPIRATION OF THE FRANCHISE OR OTHERWISE | 28   |
|       | 14.1 | Termination of Rights and Obligations, Payments of Amounts Owed, etc.                         | 28   |
|       | 14.2 | Marks, Trade Dress, Phone Listings, etc.                                                      | 28   |
| 15.   |      | ACKNOWLEDGMENTS AND REPRESENTATIONS, ENTIRE AGREEMENT, NO FIDUCIARY RELATIONSHIP, ETC.        | 29   |
| 16.   |      | TRANSFERABILITY OF INTEREST                                                                   | 32   |
|       | 16.1 | Transfers By Us                                                                               | 32   |
|       | 16.2 | Transfers By You                                                                              | 32   |
|       | 16.3 | Death or Disability of Franchisee                                                             | 33   |
|       | 16.4 | Effect of Consent to Transfer                                                                 | 33   |
|       | 16.5 | Our Right-of-First-Refusal                                                                    | 34   |
|       | 16.6 | Our Right to Purchase Any or All of the Assets of Your Traditional Slender Lady Center on Expiration or Termination, During First 18 Months, etc. at Fair Market Value | 36 |
| 17.   |      | GRANT OF SECURITY INTEREST                                                                    | 36   |
| 18.   |      | NOTICES                                                                                       | 37   |

19.     RELATIONSHIP OF THE PARTIES; INDEMNIFICATION.......................................37
        19.1    Independent Contractor ........................................................................37
        19.2    No Liability for Acts of Other Party.........................................................37
**Section**
**Page**

        19.3    Taxes ...................................................................................................37
        19.4    Responsibility, Indemnity, etc. ..............................................................37
        19.5    Disclosure.............................................................................................38

20.     DISPUTE AVOIDANCE AND RESOLUTION...........................................................38
        20.1    Mediation and Mandatory Binding Arbitration, Waiver Of Right To Trial By Jury, etc. ....38
        20.2    Venue, Waiver Of Rights To Trial By Jury, Limitation On Damages, etc. ......................42
        20.3    Prior Notice of Claims By You ...............................................................43
        20.4    Periods in Which to Make Claims ..........................................................44
        20.5    Withholding Consent .............................................................................44
        20.6    Survival and Construction......................................................................45
        20.7    Costs and Attorneys' Fees ....................................................................45
        20.8    Validity and Execution ..........................................................................45
        20.9    Binding Effect, Modification and Representations ....................................45
        20.10   Construction, etc....................................................................................46
        20.11   Non-Retention of Funds.........................................................................47
        20.12   Severability; Substitution of Valid Provisions ........................................47
        20.13   Waivers..................................................................................................47
        20.14   Choice of Laws .....................................................................................47

21.     COUNTERPARTS ..............................................................................................48

22.     EXHIBITS .........................................................................................................48

**EXHIBITS**

Exhibit 2.2 - Territory

Owner's Guaranty and Assumption of Corporate Franchisee's Obligations

Current Form of Slender Lady, Inc. Releasing Language

## ITEM 23: RECEIPT
### (RETURN THIS COPY TO US)

THIS OFFERING CIRCULAR SUMMARIZES PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY.

IF SLENDER LADY, INC. OFFERS YOU A FRANCHISE, SLENDER LADY, INC. MUST PROVIDE THIS OFFERING CIRCULAR AND ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE TO YOU BY THE EARLIEST OF:

1.     THE FIRST PERSONAL MEETING TO DISCUSS OUR FRANCHISE; OR
2.     TEN BUSINESS DAYS BEFORE SIGNING OF A BINDING AGREEMENT
3.     TEN BUSINESS DAYS BEFORE ANY PAYMENT TO SLENDER LADY, INC.

IF SLENDER LADY, INC. OFFERS YOU A FRANCHISE IN THE STATE OF ILLINOIS, SLENDER LADY, INC MUST PROVIDE THIS OFFERING CIRCULAR TO YOU BY THE EARLIEST OF:

1.     THE FIRST PERSONAL MEETING TO DISCUSS OUR FRANCHISE; OR
2.     FOURTEEN BUSINESS DAYS BEFORE SIGNING OF A BINDING AGREEMENT;  OR
3.     FOURTEEN BUSINESS DAYS BEFORE ANY PAYMENT TO SLENDER LADY, INC.

IF SLENDER LADY, INC. DOES NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON D.C. 20580 AND THE APPROPRIATE STATE AGENCY IDENTIFIED ON EXHIBIT D.

SIGNING THIS RECEIPT DOES NOT OBLIGATE YOU TO PURCHASE A SLENDER LADY FRANCHISE NOR DOES IT OBLIGATE SLENDER LADY, INC. TO AWARD YOU A FRANCHISE.

I HAVE RECEIVED A UNIFORM FRANCHISE OFFERING CIRCULAR DATED ~~6/27~~ *3/14*, 2003. THIS OFFERING CIRCULAR INCLUDES THE FOLLOWING EXHIBITS:

EXHIBIT A     FINANCIAL INFORMATION
EXHIBIT B     FRANCHISE AGREEMENT
EXHIBIT C     SECURITY AGREEMENT AND NOTE
EXHIBIT D     STATE ADMINISTRATORS/AGENTS FOR SERVICE OF PROCESS
EXHIBIT E     COLLATERAL ASSIGNMENT OF LEASE
EXHIBIT F     STATE ADDENDA
EXHIBIT G     TABLE OF CONTENTS OF OPERATIONS MANUAL
EXHIBIT H     LIST OF FRANCHISE BROKERS
EXHIBIT I     ASSET PURCHASE AGREEMENT
EXHIBIT J     LIST OF CURRENT AND FORMER FRANCHISEES
EXHIBIT K     STATEMENT OF PROSPECTIVE FRANCHISEE
EXHIBIT L     RECEIPT

DATE: _6/27/03_

PROSPECTIVE FRANCHISEE (Individual) PROSPECTIVE FRANCHISEE (Corp., LLC or Partnership)

_JOHN BLADON / MAGGIE TYLEN_  _SNOWTREE ENTERPRISES_
Printed Name                              Legal Name of Franchisee Entity

X _MB Tyler_                           a _____
Signature                                 Jurisdiction of Formation
                                          _LIMITED LIABILITY COMPANY_
                                          Corporation, LLC or Partnership

# Slender Lady, Inc.
# Franchise Agreement

This Slender Lady, Inc. Franchise Agreement (the "Agreement") is made this _17th_ day of
_JULY, 2003_, by and between Slender Lady, Inc., a Delaware corporation, having its
principal place of business at 45 NE Loop 410, Suite 501, San Antonio, Texas 78216, and
_SNOWTREE ENTERPRISES LLC_ of
_WAYLAND_, _MASSACHUSETTS_.

## 1.    INTRODUCTION, DEFINITIONS, AND PRELIMINARY AGREEMENTS.

**1.1    Introduction.** We've developed, and plan to continue developing, methods of operating
wellness centers, which offer personal weight management counseling, proprietary nutritional products
and a thirty minute fitness program. These businesses, referred to in this Agreement as "Slender Lady®
Centers," operate at locations that feature a distinctive format and method of doing business (the
"Slender Lady® System" as defined below), any element of which we can modify from time-to-time in our
sole and absolute discretion and with which you'll promptly comply.  We own and operate, and
selectively award franchises for others to own and operate, Slender Lady® Centers using the Slender
Lady® System and the Marks (as defined below).  You've applied for a franchise to own and operate a
Slender Lady Center at the Premises (as defined below) and your application has been approved by us
in reliance on all of the representations made in your application.

**1.2    Definitions**.  For purposes of this Franchise Agreement, the following terms have the
meanings listed below.  Other terms used in this Agreement are defined and construed in the context in
which they occur.

**"Affiliate"** - Any person, company or other entity which controls, is controlled by or is under
common control with another person, company or other entity, as well as any spouse, parent,
child and/or sibling and any entity controlled by any spouse, parent, child and/or sibling.

**"Agreement"** - This Franchise Agreement.

**"Brand"** - The Slender Lady® brand, as applied to various goods and/or services as authorized
by us from time-to-time.

**"Designated Equipment"** - Equipment that meets our requirements and is to be obtained and
used by you in the operation of your Slender Lady Center including (but not limited to) exercise
equipment, cash registers, computers, point of sale system equipment and software.

**"Face-to-Face Meeting"** – A meeting in which all of the disputants are physically present at the
same time and place, and does not include  teleconferencing or any other electronic form of
communication.

**"Franchise"** - The right to operate a single Slender Lady Center at the Premises, pursuant to the
terms and conditions of this Agreement.

**"Franchisor-Related Persons/Entities"** - Slender Lady, Inc., the Marketing Fund, any and each
Slender Lady FOA, FAC, and MAC (and their members) and each and all of the following,
whether past, current and/or future: each and all company(ies)/person(s) acting by, through,
under, in concert, affiliated and/or associated in any way with us, and/or any of the foregoing,
together with each and all of the partners, shareholders, officers, directors, agents, attorneys,
accountants, and/or employees of us and/or any of the foregoing, as well as each and all of the

successors and/or assigns of us and/or any of the foregoing.

**"Good Standing"** - "Good Standing" includes (but is not limited to) you and each affiliate of yours (a) not being in default or threat of default under this Agreement and/or any other agreement or any other legal obligation to us and/or any affiliate of ours and (b) operating each Slender Lady Franchise in which you and/or any affiliate of yours has any ownership or other interest, in full compliance with the System and Manuals and all of our other requirements.

**"Slender Lady Center"** - The Slender Lady Center you are franchised to operate at the Premises pursuant to this Agreement.

**"Manuals"** - One or more handbooks, manuals, bulletins and/or volumes, other written materials and video, audio and/or software media (including materials distributed electronically, whether by Internet, intranet or otherwise), regardless of title, containing (among other things) specifications, standards, policies and procedures prescribed from time-to-time by us and to be followed by you in connection with the operation, marketing or otherwise of your Slender Lady Center and your performance under this Agreement, including (but not limited to) all goods and services to be sold and/or provided at or from your Slender Lady Center and/or in association with the Marks. The Manuals include all changes and supplements issued by us in the future, each of which you'll promptly comply with.

**"Marks"** - The trademarks, service marks and other commercial symbols now and/or in the future owned by us and which we designate, from time to time, to be used to identify the services and/or products offered by Slender Lady Centers, including (but not limited to) the mark "Slender Lady®," Sharp-n-Slender™ the Trade Dress and certain associated logos.

**"Premises"** - The location at which you will operate a single Slender Lady Center, as permitted and accepted by us pursuant to this Agreement.

**"Products" and "Services"** - Products and services designated by us from time to time for use, sale, lease and rental or to be otherwise used and/or provided at or from your Slender Lady Center, and/or in association with the Marks, including (but not limited to) nutritional supplement food products, career apparel, promotional materials, and various administrative and billing services.

**"Similar Business"** - Any enterprise (including not-for-profit operations) that now and/or in the future offers, sells, distributes, provides or is otherwise involved or deals with, whether at wholesale, retail or otherwise, any goods and/or services (including, among others, the Products) now or in the future authorized by us to be offered at or from Slender Lady Centers, or similar products, including any business awarding franchises or licenses to others to operate or be involved with any such business and including (among others) any enterprise that offers fitness exercises, weight loss instruction, behavior modification and/or nutritional programs.

**"System"** - The distinctive format and method of doing business now or in the future developed, used and/or modified by us in our sole and absolute discretion for the operation of an outlet offering to women various fitness exercises and/or a weight loss instruction, behavior modification and nutritional program including (but not limited to) (a) distinguishing characteristics related to the image, design, appearance, layout and color scheme of a Slender lady Center, (b) design, style, color and other distinguishing characteristics of fixtures, showcases, signs and furnishings, (c) layout, design and selection of equipment, (d) specifications used in preparing Products and/or Services for sale, (e) methods used for selecting, purchasing, marketing, displaying and selling Products and/or Services, (f) operating, marketing and other systems, procedures and standards and (g) the standards of quality, service and cleanliness used in the operation of a Slender Lady Center.

"**System Standards**" - Standards, specifications, requirements and/or otherwise specified by us from time to time and to be complied with by you, pertaining to the operation (and/or otherwise) of your Slender Lady Center.

"**Territory**" - The geographical area described in Exhibit 2.2.

"**Trade Dress**" - The Slender Lady design and image developed and owned by us for Slender Lady Centers, as it currently exists and as it may be revised and further developed by us from time to time in our sole and absolute discretion.

"**Us**," "**We**," "**Our**" or "**Franchisor**" - Slender Lady, Inc., a Delaware corporation.

"**You**," "**Your**" or "**Franchisee**" - The individual(s) signing this Agreement as Franchisee (If there's more than one Franchisee, each is jointly and severally obligated under this Agreement and all other agreements with us.).

## 2.    AWARD OF FRANCHISE

**2.1**    **Award of Franchise; Term, Your Basic Commitment.**  We're pleased to award you a franchise to operate a single Slender Lady Center at the Premises only, and to use the Marks and the Slender Lady® System in the operation thereof for a term of seven (7) years, commencing on the date of this Agreement, subject to the possible award of a successor franchise as set forth elsewhere in this Agreement, provided that the term of this Agreement will, in any event, end on the expiration of the initial (or remaining initial) term of the lease or sublease for the Premises.

You agree that you will at all times faithfully, honestly and diligently perform your obligations hereunder, and that you will continuously exert your best efforts to promote, enhance and maximize the business of your Slender Lady Center and the goodwill of the Marks. You won't conduct the business of the Slender Lady Center or use the Marks from any location other than the Premises or for any purpose other than the operation of a franchised Slender Lady Center in Good Standing.

You understand and agree that critical to the Slender Lady System and this Agreement, as well as your possible success, is full adherence by you to each element of the Slender Lady System including (among other things) use and sale of only those Products, Designated Equipment and suppliers as are approved by us from time to time, using only prescribed building and equipment layouts and designs, strictly adhering to our then-current standards of quality, service and cleanliness, maintaining a close and personal working relationship with your Slender Lady Center, and accepting personal accountability for the performance of your obligations under this and other agreements. Accordingly, you will continuously comply with all (and other) such elements of the then-current Slender Lady System.

**2.2**    **Territory.**  During the term of this Agreement we will not enter into a Franchise Agreement licensing a Slender Lady Center or open a Slender Lady Center to be owned by us, to be located inside the area (the "Territory") described on Exhibit 2.2, provided that Franchisee (and each affiliate) does not commit any default under any of its obligations to and/or agreements under this Agreement (or otherwise) with us and/or any affiliate and, in any event, subject to our rights as set forth in this Agreement, including the provisions of this Section.

If the location for the Premises has not been identified by the date of this Agreement, Exhibit 2.2 will state such fact and the Territory will be specified by us and identified on a map to be initialed by you and us, and attached to and made a part of this Agreement within fifteen (15) days from our notice to you of our acceptance of the location for the Premises. If, in such situation, you disagree with the Territory we have specified and provide us with written notice of such disagreement within fifteen (15) days of our notice to you of our specification of the Territory, we may either (a) cancel all of our obligations under

this Agreement, return your Initial Franchise Fee and receive from you (and each affiliate of yours) a general release, in form prescribed by us, of any and all claims, liabilities and/or obligations of any nature whatsoever, however arising, known or unknown, against us and/or any or all of the Franchisor-Related Persons/Entities, and your post-termination obligations, including those of indemnity, confidentiality and non-competition, will survive such cancellation or (b) submit the question of the appropriate Territory to mediation and binding arbitration as provided in this Agreement [provided that in no case may the arbitrator or any court award a Territory with a radius from the Premises of more than five (5) miles and you and we will be bound by the result.

Other than as expressly provided above, you do not have, have not paid for, and have no expectation of receiving any benefits of any "exclusive territory" or any "exclusive," "protected" or "reserved" territorial, similar or other rights.   No such rights are granted or will be inferred and there is, and will be, no limitation of any type on the rights of us or any of the Franchisor-Related Persons/Entities to locate and/or consent to the location of other Slender Lady Centers or other distribution facilities and/or channels of distribution of any type, whether or not using the Slender Lady System, the Marks and/or Trade Dress, and/or involved in any Similar Business or otherwise, at any location regardless of the distance from, impact on, or vicinity of your Slender Lady Center or the number of Slender Lady Centers, other outlets or otherwise in any area or market.   You have no right to exclude, control or impose conditions on the location or development of future Slender Lady Centers (or other) Franchisor-owned, franchised or other units of any type or at any location.   In particular, you understand and agree that some or all of the Franchisor-Related Persons/Entities currently, and may in the future, own and operate, and/or franchise or otherwise license, Similar (and/or competitive) Businesses and concepts located (or to be located) anywhere, including in proximity to you, and that such businesses may now or in the future be in direct or indirect competition with you.

In any event, and notwithstanding anything else in this Franchise Agreement or otherwise, we (and/or those we appoint) (a) can sell or otherwise distribute any products or services anywhere, whether at wholesale, retail or otherwise and whether or not using the Marks or Slender Lady® System or otherwise and without restriction of any kind, in any alternative or other channel of distribution (including, but not limited to, supermarkets, restaurants, health clubs or otherwise), whether or not located in the Territory, and to customers located anywhere (b) retain all rights to, and you have no expectations or rights with respect to, "special distribution opportunities" (whether or not located in the Territory), including existing or potential Slender Lady outlets in non-traditional settings and (c) may own and/or operate ourselves or authorize others to own and/or operate (1) Slender Lady Centers located outside the Territory using the Marks and/or System and (2) any business anywhere, whether using the Marks and/or Slender Lady System or not, which is not substantially similar to and/or competitive with the business franchised to you under this Agreement.   In any event, the rights and obligations of this Section (and of this entire Agreement) run directly between you and us, are not intended to create any third-party beneficiary or similar rights or obligations (except for benefits to the Franchisor-Related Persons/Entities) and we do not have any duty to take any legal or other actions against, or with respect to, any other Slender Lady Franchisees in connection with any alleged violation of their obligations.

We (and each and all of the Franchisor-Related Persons/Entities) can acquire, or engage in any other transaction with, other businesses (competitive or not), with companies and/or units located anywhere, including in proximity to your Slender Lady Center including arrangements where other units are (or are not) converted to the Slender Lady or other format (including using the Slender Lady System and/or the Names and Marks and/or Trade Dress) and/or any other format and/or in which we and/or any of the Franchisor-Related Entities are acquired, and/or company-owned, franchised or other businesses (including your Slender Lady Center) are converted to another format (whether competitive or not), maintained as a new concept under the Slender Lady System and/or the Names and Marks and/or Trade Dress or maintained as a separate concept.

We (and each and all of the Franchisor-Related Persons/Entities) can develop or become associated with other concepts (including dual branding and/or other franchise systems) for the same,

similar, related, competitive or different products and/or services, whether or not using the Slender Lady System and/or the Marks, and may grant franchises or other rights with respect to locations and/or businesses in connection therewith. Units offering these concepts can be located anywhere, in our sole and absolute discretion, including in proximity to your Slender Lady Center.

Of course, if you are unable or unwilling to service any potential or existing customer and/or account, we (and/or those we appoint) may service such customer and/or account without any obligation to you.

You agree to provide access to and use of your Center by members of other Centers and likewise members with whom your Center has contracted for services will be provided reciprocal privileges at other Centers. Other than as expressly reserved to us or as otherwise provided in this Agreement, we do not define boundaries of an area in which you, any other Slender Lady franchisee, or we can advertise, nor do we designate a specific customer base. We have not established any minimum sales quotas that you must meet. Monthly membership fees will remain payable to the Center with whom the member has contracted until the member's contract with such Center expires. However, you may sell approved products from approved suppliers to anyone and will retain all revenue from such product sales to members regardless of which Center sold that member a membership.

3.    **SUCCESSOR FRANCHISE.**

    **3.1    Regular Successor Franchises**. On the expiration of the initial term of this Franchise Agreement and each seven (7) years thereafter, you will be awarded and you will accept a successor franchise term of seven (7) years, unless you or we have notified the other no more than 180 nor less than 60 days prior to the end of the then-current term (or successor term) that you or we do not wish to enter into a successor franchise. The successor franchises may materially differ from this Franchise Agreement and its requirements. In no event shall we be obligated to negotiate or obtain any renewal, extension or otherwise of any lease or sublease, or solicit or accept any proposal from the landlord (or other person/entity controlling the premises) for a renewal, extension or otherwise of any lease or sublease, even if on the same terms and conditions as have previously been applicable to the premises.

    **3.2    Your Obligations**. In connection with the award of the first successor (7 year) franchise, you will satisfy all of the following obligations, each of which are agreed to be reasonable, together with such other obligations and/or conditions as we specify and are reasonable at the time:

    (1)    You (and each affiliate of yours) will have fully and continuously complied with this Agreement and all other agreements with us (and/or any affiliate of ours), in each case without any defaults, cured or uncured, during the term (including all of the conditions set out below);

    (2)    You must maintain possession of your Premises and by the expiration date of this Agreement (a) your Slender Lady Center and its operations must have been brought into full compliance with the specifications and standards then-applicable for new Slender Lady Centers, including a full upgrade to the same first-class condition as new Slender Lady Centers, which may include (but is not limited to) new equipment, furniture, furnishings, tenant improvements, decor package, signage, compliance with all then-current standards for facility design, software, provision of goods and services, methods of operation and other Slender Lady System Standards, plus such renovation and modernization of the Slender Lady Center as we may require to reflect the then-current standards and image of the System, all at your sole expense, and (b) you must present evidence satisfactory to us that you have the right to remain in possession of your Slender Lady Center for the duration of the successor franchise or, in the event you are unable to maintain possession of the premises or in our judgment your Slender Lady Center should be relocated, you must secure substitute premises consented to by us and have furnished, stocked and equipped such premises to bring your Slender Lady Center and inventory into full compliance with our then-current requirements by the expiration date of this Agreement;

(3)    Unless we have given you notice of intent not to enter into a successor franchise, we will, at least sixty (60) days prior to the expiration of the then-current term, furnish you with written notice of: (a) any reasons which could cause us not to award the successor franchise, including any deficiencies which require correction and a schedule for correction thereof by you, and (b) our then-current requirements relating to the image, appearance, decoration, furnishing, equipping, stocking and programs of a Slender Lady Center, and a schedule for effecting such upgrading, modifications or otherwise as a condition of receiving the successor franchise.  Prior to thirty (30) days before the expiration date of the then-current term you will fully cure all such deficiencies and fully satisfy all such requirements and conditions.  You understand and agree that we may refuse to award a successor franchise if, in our reasonable judgment, you (or any affiliate of yours) have failed to render satisfactory performance as a Franchisee in any operational or other areas (including, but not limited to safety, compliance with all Manuals, adverse impact on the Marks and associated goodwill, etc.), whether or not such failure constitutes or constituted a default.   The award of the successor franchise may be conditioned by us on (among other things) your (and your affiliates') continued compliance with all the terms and conditions of this Agreement (and all other agreements with us and/or any affiliate) up to the date of expiration and correction of any deficiencies within the periods specified by us.

(4)    You (and each affiliate of yours) must satisfy all monetary obligations owed to us and any company affiliated with us, including acceleration of the principal amount of any notes outstanding to us and/or any affiliate.  If you have not timely and fully met such and all other obligations throughout the term of this Agreement, we may refuse to award the successor franchise;

(5)    You must execute our then-current form of Franchise Agreement and related documents, including guarantees, as are then customarily used by us in the award of franchises for Slender Lady Centers, the terms (with the exception of economic terms) of which may materially differ from the terms of this Agreement; provided, however, that you will not be required to pay the then-current initial franchise fee.  In our sole and absolute discretion, and to further your and our mutual interests in having consistent documents to cover all of your units, and to update documents to reflect changed competitive and other conditions we can require you to sign our then-current form of Franchise Agreement to cover all Slender Lady Centers in which you (or any affiliate) then have an interest;

(6)    You must comply with our then-current qualification and training requirements.  We may require your personnel to attend and successfully complete any retraining program(s), at such times and location(s) as we then specify.  There will be no charge for any retraining program(s), but you'll be responsible for all travel, meals, lodging and other expenses of your personnel; and

(7)    You (and each owner and/or affiliate of yours) must execute a general release, in form prescribed by us, of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, known or unknown, against us and/or any or all of the Franchisor-Related Persons/Entities.  If you fail to execute such a release, the awarding of a successor franchise will be the equivalent of the granting of such release, since you and we agree that it would be inappropriate and improper for you to continue in a franchise (or other) relationship with us, and have the right to use the Names, Marks and System, if you had any claims, liabilities and/or obligations, of any nature whatsoever, however arising, known or unknown, against us (or other persons/entities covered by such a release) or otherwise failed to execute such a release, particularly in view of the fact that you are not being charged a full initial franchise fee in connection with the successor franchise.

Failure by you and/or your owners to timely complete such requirements will give us the option to not award the successor franchise.

Any award of any subsequent successor (7 year) franchise will be governed by the provisions on successor franchises, etc. of the franchise agreement under which you are then operating, which may materially differ from such provisions (or otherwise) of this Agreement.

If, at any time, you or any affiliate is to receive one or more successor, additional, other and/or further franchise(s) from us [we having no obligation to award you any such additional, other and/or further franchise(s)], whether or not a successor franchise, you, each of your affiliates, each owner of the Franchisee, the new franchisee and each owner thereof will at each such time sign a general release, in form prescribed by us, of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, <u>known or unknown</u>, against us and/or any or all of the Franchisor-Related Persons/Entities except (where so required by applicable law) for any claims exclusively related to the offer and sale of the successor, additional, other and/or further franchise(s).  If we should, through inadvertence or otherwise, fail to require such separate release at any time, the awarding of the successor, additional, other and/or further franchise(s) will be regarded as the equivalent of the granting of such releases.

## 4.    DEVELOPMENT AND OPENING OF YOUR SLENDER LADY CENTER.

**4.1    Site Selection - Development.**  If the site for your Slender Lady Center has not been identified and purchased (or leased) by you and accepted by us by the date of this Agreement, then within three (3) months from the date of this Agreement [and, in any event, within three (3) weeks after you're scheduled to begin initial training] you must purchase or lease (and obtain possession of) a site suitable for the operation of your Slender Lady Center and acceptable to us.  Within the same periods, you must: (1) secure all financing required to fully develop your Slender Lady Center; (2) submit to us for consent any proposed modifications to the Slender Lady Center Design Standards to comply with applicable ordinances, building codes, permit requirements, lease requirements and restrictions (any modifications will be at your expense); (3) obtain all required zoning changes, building, utility, sign, health, sanitation and business permits and licenses and any other required permits and licenses; (4) construct all required improvements in compliance with construction plans and specifications supplied or consented to by us; (5) decorate your Slender Lady Center in compliance with plans and specifications consented to by us; (6) purchase and install all required equipment, furniture, fixtures and signs (including the Designated Equipment and computer hardware and software); (7) purchase an opening inventory of the Products designated by us; (8) obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating and installation services; and (9) open your Slender Lady Center for business with the general public.

Within such periods you'll also select and employ a licensed contractor reasonably consented to by us, commence construction and/or development as soon as possible and expeditiously attend to its completion, purchase and pay for all supplies, purchase, pay for and attend to the installation of all fixtures and equipment, train all employees, obtain all required insurance, permits and licenses and do everything necessary for your Slender Lady Center to open for business.  We do not warrant or guaranty to you in any way that any contractor (even one referred to you by us) is suitable, competent, reliable or otherwise able to perform adequately the tasks for which they are hired and <u>you're the only person/company with any responsibility for the work of any contractor selected and/or employed by you.</u>  We're unable to provide any assurance as to costs of construction or otherwise, or as to when you may be open for business, since such matters are not within our control.

We won't unreasonably withhold our acceptance of a site that meets our standards but we can make no assurance that appropriate sites will be available, the terms on which possession may be obtained or otherwise, all such matters being your sole responsibility.

If you are unable to complete any of such obligations within such periods, we may (but have no obligation to) at any time thereafter terminate our obligations and your rights under this Agreement, provided we refund to you the <u>lesser</u> of (a) one-half (1/2) of the initial franchise fee paid to us pursuant to this Agreement or (b) the initial franchise fee less all expenses (including legal fees, commissions, training costs, etc.) incurred in connection with such franchising and termination; and you will concurrently execute documents acceptable to us, providing for (1) continuation of your indemnification,

confidentiality and non-competition obligations and the dispute avoidance and resolution provisions of this Agreement, including those of Article 15 and Article 20, and (2) a general release, in form prescribed by us, of any and all claims, liabilities and/or obligations of any nature whatsoever, however arising, known or unknown, against us and/or any or all of the Franchisor-Related Persons/Entities.

You won't make any commitments with respect to any location or operate a Slender Lady Center and/or use any of the Marks from or at any location (nor will you relocate your Slender Lady Center) until and unless we've accepted such location. If there is any disagreement or dispute relating to any aspect of your site, you and we will resolve it through good faith mediation/arbitration as provided in this Agreement.

We strongly recommend that you have all matters related to site selection and securing reviewed by your own independent attorney, real estate broker, architect and other professionals retained by you. While the selection of a site by you is subject to our reasonable consent, and although this franchise may be awarded for a specific existing location, neither we nor any company or person will recommend or approve any particular location or any related services to you. Acceptance by us of any location is in no way a recommendation, approval or endorsement of such location nor a representation or warranty as to its legal or business availability, suitability, appropriateness, success potential or otherwise and we cannot guarantee success for any location. You're the only person and/or company with any liability or responsibility for those decisions and matters.

In any case, you understand and agree that the selection and securing of a site, the negotiation of a lease or purchase, the selection of developers, real estate agents, site selection specialists, contractors, etc., financing and all matters related in any way to your site are exclusively and entirely your sole and ultimate responsibility and that neither we, any Franchisor-Related Persons/Entities nor any other person or company affiliated or associated with us in any way will have any liability or responsibility with respect to any matters related in any way to the site for your Slender Lady Center, including (but not limited to) site location, identification, evaluation, selection, lease/purchase negotiation, financing, review of documents, construction, build-out, compliance with local requirements, suitability for any use or purpose and/or any other aspect of the development process (and any related steps) or otherwise, all such responsibilities being solely yours.

We may ~~(but have no obligation to)~~ make available to you standard and/or site-specific plans and specifications to be utilized by you in the construction or otherwise of your Slender Lady Center. You'll obtain, at your sole expense, all further qualified architectural and engineering services to prepare surveys, site and foundation plans and adapt any plans and specifications to your location and all applicable laws, regulations and ordinances. Any changes from plans provided by us must be submitted to us for our consent, which we may grant, condition or withhold in our sole and absolute discretion. Neither we nor any other person or company recommended by and/or affiliated in any way with us will have any liability with respect to any plans, specifications and/or other items/services provided to you and/or to be utilized by you in the construction or otherwise of your Slender Lady Center, or any deviations or modifications therefrom, nor with respect to the preparation, construction, operation or otherwise of your Slender Lady Center, whether in accordance with standard plans or otherwise, all such responsibilities being solely yours.

We make no representations, guarantees or otherwise as to the costs of development and build-out (or otherwise) of your Slender Lady Center, the date on which your Slender Lady Center will be open for business or otherwise, such matters not being within our sole control. Our review of and/or consent to any plans (or modifications) submitted by you, your development, construction and/or other activities, and our providing of any plans or other assistance, or otherwise, will be solely for the purpose of determining compliance with Slender Lady Center System standards and you are the sole person/entity responsible for constructing and operating your Slender Lady Center in compliance with all applicable legal requirements.

You agree that without our ability to limit our (and others') liability as set forth in this Agreement (and, in particular, this Section), we wouldn't be willing to award this Franchise to you or to be involved in any way in assisting you in these matters and would, instead, consider developing the location as a company-owned unit.

**4.2    Lease of Premises.** Any lease or sublease for the Premises must be satisfactory to us in our sole and absolute discretion and must, in any event, contain the following provisions through Lease Addendum, Collateral Assignment of Lease or otherwise, as acceptable to us in our sole and absolute discretion:

(a)    Providing us with the right, at our sole option at any time and without further consideration, to receive an assignment of your leasehold interest and take possession of the Premises, whether on termination, cancellation, rescission or expiration of your rights under any lease/sublease or under this Agreement or otherwise, in each case without the lessor's or sublessor's consent and specifying that the lessor/sublessor will accept us as a substitute tenant on notice from us that we are exercising our rights, subject to payment of no more than 30 days of past due rent.  If we exercise this option and you, and each affiliate of yours, are not in default, or under notice of default, and if your rights have not been terminated or expired, under this Agreement or any other agreement with us or any affiliate of ours, we'll sublease the Premises to you on the same terms as we lease it, subject to our usual security deposit and other conditions.  You agree to do all acts necessary or appropriate to accomplish such assignment, on our request and will, at the same time you sign this Agreement, sign the Collateral Assignment of Lease;

(b)    Obligating the lessor/sublessor to provide us with all sales and other information it may have, whether provided by you or otherwise, related to the operation of your Slender Lady Center;

(c)    Evidencing your right to operate your Slender Lady Center in accordance with this Agreement and the Manuals, subject only to the provisions of applicable law;

(d)    Prohibiting you from subleasing, assigning, hypothecating, pledging or otherwise all or any part of your rights, extending the term or renewing or modifying the lease without our prior written consent, which may be withheld in our sole and absolute discretion;

(e)    Requiring the lessor/sublessor to concurrently provide us with a copy of any written notice of default under the lease/sublease and granting us the right (but without any obligation on our part) to cure any default under the lease and providing that if you fail to effect such cure during the time period permitted under the lease/sublease, then within thirty (30) days after the expiration of the period in which you can cure the default we may (at our option) receive an assignment of your leasehold interest but without any liability for past defaults or other obligations other than those solely related to our period of occupancy;

(f)    Providing that the premises will be used only for the operation of a Slender Lady Center pursuant to a Franchise Agreement with us in Good Standing;

(g)    Providing that any default by the Franchisee under this Agreement or any other agreement with us (or any of our affiliates) may, at our option, constitute a default under the lease (you agreeing that any default by you under the lease may, at our option, constitute a default under this Agreement); and

(h)    Providing that no sale, assignment or transfer of your leasehold interest will be approved or otherwise consented to, or any change, addition, or other modification to the lease or other instruments be made, without obtaining our prior written consent, which we may grant, condition or withhold in our sole and absolute discretion.

You won't execute a lease or sublease, or any modification or amendment, without our prior written consent, which we may grant, condition or withhold in our sole and absolute discretion. You'll deliver a copy of the signed lease or sublease to us within five (5) days after it is signed. If you own or acquire the Premises and we request, you'll enter into a lease with us for a term equal to the term of the Franchise (with matching renewal options) on commercially reasonable terms, and will sublease the Premises from us on the same terms as the prime lease, subject to the requirements of this Section and granting us benefits substantially identical to those set out above.

If such provisions are not included in the lease or other instruments we may, without liability and at our sole option at any time (a) require that you immediately cause such provisions to be inserted or (b) terminate your rights and our obligations under this Agreement. *℟*

**4.3    Slender Lady Center Design Standards.** We may ~~(but are not required to)~~ furnish you with (and may update from time to time) standards, specifications and other requirements for design, decoration, layout, equipment, furniture, fixtures, signs and other items for Slender Lady Centers (the "Slender Lady Center Design Standards"), with which you'll promptly comply. You agree that the Slender Lady Center Store Design Standards are an integral part of the Slender Lady® System and that your Slender Lady Center will be developed, constructed, designed and operated in full compliance with the latest Slender Lady Center Design Standards at all times.

**4.4    Equipment, Furniture, Fixtures and Signs.** You'll use in the development and operation of your Slender Lady Center only those (and each of those) brands, types and/or models of equipment, furniture, fixtures and signs as are consented to by us. You'll purchase or otherwise obtain approved brands, types and/or models of equipment, fixtures and signs only from suppliers designated by us, which may include and/or be limited to ourselves and/or our affiliates. *You may also use other equipment with our consent, which will not be unreasonably*

**4.5    Slender Lady Center Opening.** You won't open your Slender Lady Center for business *withheld* until: (1) we notify you that all of your pre-opening obligations have been fulfilled; (2) pre-opening training *or delayed.* of all of your personnel has been completed; (3) all amounts then due us (and/or any affiliate) have been *℟* paid; and (4) we've been furnished with copies of all insurance policies (or such other evidence of insurance coverage and payment of premiums as we request), leases/subleases and other documents as required by this Agreement. You'll comply with these conditions and be prepared to open your Slender Lady Center for business within the periods of time specified by this Agreement and, in any case, you'll open your Slender Lady Center for business and commence business pursuant to this Agreement within five (5) days after we give notice to you stating that your Slender Lady Center is ready for opening.

**4.6    Relocation of Slender Lady Center Premises.** If your lease or sublease for your Slender Lady Center expires or terminates without your fault, if the Premises are damaged, condemned or otherwise rendered unusable, or if, in your and our judgment, there is a change in the character of the location of the Premises sufficiently detrimental to its business potential to warrant its relocation, you will relocate your Slender Lady Center and we'll grant permission for such relocation to a location and premises acceptable to us in our sole and absolute discretion and without charging you an additional initial franchise fee, but any such relocation will be at your sole expense and you (and each affiliate of yours) will sign a general release, in form prescribed by us, of any and all claims, liabilities and/or obligations of any nature whatsoever, however arising, known or unknown, against us and/or any or all of the Franchisor-Related Persons/Entities and the new location must be within the Territory.

## 5.    TRAINING AND GUIDANCE

**5.1    Initial Training.** We will provide a training class of approximately one week in length for Franchisee and one employee. All or any portion of this training may be provided at our headquarters, a Slender Lady Center selected by us or your location and may be provided prior to and/or in connection with, your opening for business. Any portion of such week may consist of our operations assistance,

training and advice in connection with your opening for business. Training must be commenced within 30 days after a suitable site has been selected by Franchisee and approved by Franchisor. This training program must be satisfactorily completed before Franchisee can open its business. The training is to be provided by Franchisor without additional charge to Franchisee at a place and time designated by Franchisor. All expenses of Franchisee and its personnel incident to attendance at the instruction shall be borne by Franchisee. The Franchisee and any on-site Manager must take and successfully complete Franchisor's mandatory initial training class. If you (or your affiliate) already own(s) a Slender Lady Center, we may, in our sole and absolute discretion, provide a shortened training course or provide no training.

If we, in our sole and absolute discretion, determine that you (or a managing partner or shareholder consented to by us) have not successfully completed (or are not making satisfactory progress in) your initial training, we may cancel all of your rights (and all of our obligations) under this Agreement and/or any other agreements with you and return the Initial Franchise Fee (less $10,000 to cover our sales, training and other expenses, among other things) to you, on condition that all items furnished the Franchisee by Franchisor are first returned in the condition in which they were delivered, and you will return all manuals and you (and each affiliate of yours) will execute documentation providing for a general release, in a form prescribed by us, of any and all claims, liabilities and/or obligations of any nature whatsoever, however arising, known or unknown, against us and/or any or all of the Franchisor-Related Persons/Entities, and we will provide you with a similar release, except that your indemnity, non-competition, confidentiality obligations and the dispute avoidance and resolution provisions of this Agreement, including those of Article 15, together with the provisions of Article 20, will be preserved. Since the possibility of such termination exists, you understand that if you make any investments or sign any documents prior to completion of training, you are at risk. Alternatively, we can (in our sole and absolute discretion) require you to hire a substitute manager and arrange for him/her to complete the training program to our satisfaction.

5.2    **Manuals**. During the term of the Franchise, we will loan you (or allow you electronic or other access to) one copy of the Manuals containing mandatory and suggested specifications, standards and operating procedures prescribed from time to time by us for a Slender Lady Center, and information relative to your obligations hereunder. We can modify any aspect of the Manuals, the Slender Lady® System or specifications, standards, policies and procedures of Slender Lady Centers, to specify, among other things, brands, types and/or models of equipment which must be used by you in the operation of your Slender Lady Center, changes in the Products and Services used and/or offered by you, and/or changes in the decor, format, image, products, services, operations or otherwise of a Slender Lady Center. You'll promptly and continuously comply, at your sole expense, with all provisions of, and additions/deletions/changes to, the Manuals. You have no expectation that the Manuals (and the Slender Lady® System) will not be changed over time and you and we, in fact, anticipate that such changes will take place, in response to competitive challenges, commercial opportunities and otherwise. You'll keep your copy of the Manuals current by immediately inserting all modified pages and (at our option) destroying or returning to us all superseded material. Any such additions, deletions and/or changes will take precedence over all prior communications and in the event of a dispute, the master Manuals maintained at our office shall control. The provisions of the Manuals as modified from time to time by us and communicated to you constitute provisions of this Agreement and are binding upon you. The Manuals contain proprietary information of ours and you agree to keep the Manuals and information contained therein confidential at all times during and after the term of the Franchise.

5.3    **Additional Training**. If Franchisee requests training in addition to that provided for above, Franchisor shall provide such instruction to Franchisee or its employees at such time and place and for such duration as may be mutually convenient; provided however, that the costs of such additional training, including transportation, subsistence and a reasonable charge for the services of Franchisor's representative, shall be borne by Franchisee and, if requested by Franchisor, shall be paid in advance.  *

5.3.1    Franchisor may provide periodic free training seminars for Franchisee at such times and in such locations as selected by Franchisor. Franchisee's attendance at those seminars will be at the sole discretion of Franchisee. All expenses of Franchisee and its personnel incident to attendance at the training seminar shall be borne by Franchisee.

5.3.2    Franchisor shall continue its efforts to maintain uniform standards of quality, cleanliness, appearance and service at all Slender Lady Centers, thus protecting and enhancing the reputation of the Slender Lady System and the demand for the products and services of the System. To that end, Franchisor may establish uniform operating standards and may conduct periodic inspections of the premises and periodic evaluations of the services rendered and the products used and sold at the Franchised Unit and in all other Slender Lady Centers.

5.3.3    Franchisee shall train and instruct each person employed in the operation of Franchisee's business, other than those instructed by Franchisor, in the methods and techniques developed by Franchisor. Such training and instruction shall be based upon and given in accordance with Franchisor's training manuals, and shall be provided prior to participation by such employee in Franchisee's business.

5.3.4    On your request, and subject to our availability, we (or our designee) will provide you additional advisory assistance. We'll charge Three Hundred and Fifty Dollars ($350) per day plus travel, lodging and personal expenses for additional advisory assistance requested by you.

## 6.    YOUR SLENDER LADY CENTER — IMAGE AND OPERATION.

6.1    Condition and Appearance of Your Slender Lady Center, Regular Upgrading. It's your and our mutual expectation and agreement that your Slender Lady Center will be continuously maintained in the same first-class condition and presented to the public with the same features as new Slender Lady Centers, and that you will, at your sole expense, promptly undertake all upgrades, repairs, refurbishment, etc. as required by us from time to time in our sole and absolute discretion and that additional investment will be regularly required by you to comply with these, and other, requirements. Such upgrades may include (but are not limited to) new equipment, furniture, furnishings, tenant improvements, decor package, signage, compliance with all then-current standards for facility design, software, provision of goods and services, methods of operation, wearing of career apparel and other Slender Lady System Standards, plus such renovation and modernization of the Slender Lady as we may require to reflect the then-current standards and image of the System, all at your sole expense.

You agree that:  (1) neither your Slender Lady Center nor the Premises will be used for any purpose(s) other than the operation of a Slender Lady Center in full compliance with this Agreement and the Manuals; (2) you'll maintain the condition and appearance of your Slender Lady Center, its equipment, furniture, fixtures, signs, and the Premises in accordance with our specifications and standards, consistent with the approved image of a Slender Lady Center and as provided under the Manuals, as each may change from time-to-time; (3) you will perform such ongoing repair, maintenance and upgrading, with respect to the decor, equipment, furniture, fixtures, signs and otherwise of your Slender Lady Center and the Premises, as may be required by us from time to time in our sole and absolute discretion, including, without limitation: (a) thorough cleaning, repainting and redecorating of the interior and exterior; (b) interior and exterior repair of the Premises; (c) repair or replacement of damaged, worn out or obsolete equipment, furniture, fixtures, signs and otherwise; (4) you will not make any material alterations to the Premises or other items, or to the appearance of your Slender Lady Center as originally approved by us, without our prior written approval; and (5) you will place or display at the Premises (interior and exterior) and on all other items only such signs, emblems, lettering, logos and display and advertising materials that are designated by us from time to time.

We may, at intervals and to the extent determined by us in our sole and absolute discretion, require you to upgrade your Slender Lady Center and the Premises (including, but not limited to,

remodeling, expansion, redecoration, re-equipping, refurbishment and refurnishing the Premises, and changing any products and services offered) to meet our then-current standards and requirements, which may require additional investment by you and, subject to approval by us of plans, layouts, designs and otherwise, you will promptly and fully comply with all such requirements and, if you fail to do so, we may do so on your behalf and for your account and you will pay us the cost thereof, together with a reasonable administrative fee, within 10 days of our submission to you of any interim and/or final statement.

6.2    **Slender Lady Systems.** You acknowledge and agree that the Marks are critical to the public image and success of each Slender Lady Center and that the Marks are an integral part of the Slender Lady System. Therefore, you will use and display the Marks only in such manner as we authorize, offer only the Products and Services we authorize, and use only such equipment and other systems as we authorize from time to time, in each case promptly complying with any changes we may require, all at your sole cost and expense.

6.3    **Designated Equipment, Products and/or Suppliers.** The reputation and goodwill of each Slender Lady Center is based on, and can be maintained only by, the satisfaction of all customers. Our customers rely on the availability of a wide variety of quality Designated Equipment, Products and Services, compliance with the Slender Lady System and courteous and efficient service provided by all employees of Slender Lady Centers. We've already specified, and plan to specify in the future, various suppliers of Designated Equipment, Products and/or Services to be used or provided by Slender Lady Centers and that meet our standards and requirements, in each case in our sole and absolute discretion. Your Slender Lady Center will purchase, use and offer each of and only such types, brands and/or quality of Designated Equipment, Products and Services as we designate and, where we so require, use only suppliers as designated by us. Designated suppliers may include, and may be limited to, us and/or companies affiliated with us. We may designate a single supplier or limited number of suppliers, may designate a supplier only as to certain items and may concentrate purchases with one or more suppliers to obtain lower prices, advertising support and/or other benefits in our sole and absolute discretion. Specification of a supplier may be conditioned on requirements relating to frequency of delivery, standards of service including prompt attention to complaints, payments, contributions or other consideration to us, our affiliates, the Marketing Fund and/or otherwise or other criteria, and may be temporary, pending a further evaluation of such supplier by us, in each case in our sole and absolute discretion. In particular, you will continuously carry and feature a reasonable inventory of Slender Lady® and Sharp-n-Slender™ brand retail products.

You'll notify us in writing (and submit to us such information, specifications, and samples as we request) if you propose to purchase, use or offer any type, brand and/or quality of items that have not been previously specified by us, or if you propose to use any supplier who has not been previously specified by us for the proposed item and will arrange for prepayment of reasonable charges connected with our review and evaluation of any proposal. We'll notify you within a reasonable time whether or not you're authorized to purchase or use the proposed type, brand and/or model of such items or to deal with the proposed supplier. We may, from time to time, withhold, condition and/or revoke our approval of particular items or suppliers in our sole and absolute discretion. On receipt of written notice of revocation, you must immediately cease to sell or use any disapproved items and cease to deal with or use items from any such suppliers.

6.4    **Specifications, Standards and Operating Procedures.** You agree that the operation of your Slender Lady Center, continuously in compliance with our high standards, is vitally important to us and other Slender Lady Franchisees and is a vital element in the possible success of your Slender Lady Center, the Slender Lady Centers of other Franchisees and of us and that a lack of uniform high standards can place all Slender Lady operators at a competitive disadvantage and in a position of business risk. Accordingly, you'll operate your Slender Lady Center, and use the Marks, in prompt, continuous and full compliance with the Slender Lady System and the Manuals, as we modify each from

time to time in our sole and absolute discretion and without limitation, you promptly complying with each such modification.

In particular, you'll promptly comply with all of our ongoing requirements, standards and operating procedures relating to the operation, appearance, function, cleanliness, products, ingredients, days and hours of operation and otherwise of a Slender Lady Center (including, without limitation, use of specified equipment, products, services, programs and computer hardware and software), and with our other requirements for a Slender Lady Center, as they may be developed or changed by us from time to time in our sole and absolute discretion. You'll purchase, use and offer each of the systems, services, equipment and products designated by us and, where we so require, use only suppliers specified by us and will not use or offer any systems, services, equipment, products or suppliers not specified by us. Mandatory specifications, standards and operating procedures prescribed from time to time by us in the Manuals, or otherwise communicated to you in writing, electronically or otherwise, will constitute provisions of this Agreement as if fully set forth herein. All references to this Agreement include all such mandatory specifications, standards and operating procedures.

6.5     **Compliance with Laws and Ethical Business Practices.** You'll secure and maintain in force, in your name, all required licenses, permits and certificates relating to the operation of your Slender Lady Center. You'll operate your Slender Lady Center in full compliance with all applicable laws, ordinances and regulations including, without limitation, laws relating to health regulations, worker's compensation insurance, unemployment insurance and withholding and payment of income taxes, social security taxes and sales taxes. All advertising by you will be completely factual, in good taste in our sole and absolute discretion, and will conform to high standards of ethical advertising. You will, in all dealings with your customers, suppliers and public officials, adhere to high standards of honesty, integrity, fair dealing and ethical conduct, in each case above and beyond merely legal requirements. You'll refrain from any business or advertising practice which may be injurious to our business and the goodwill associated with the Marks and other Slender Lady Centers. You'll notify us in writing within five (5) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency, or other governmental instrumentality which relates to, or which may affect the operation or financial condition of, you and/or your Slender Lady Center.

Franchisee understands that it may be required, under applicable state law, to secure permission from the appropriate government authority to operate a weight loss and fitness center. It shall be Franchisee's responsibility to familiarize itself with all applicable laws and regulations, and Franchisor has made no representations as to the nature of such laws or Franchisee's ability to qualify under such laws. We make no representations and/or assurances as to what (if any) licenses, permits, authorizations or otherwise may be required in connection with your establishment, operation or otherwise of your Slender Lady Center, and it is your sole responsibility to determine what licenses, permits, authorizations or otherwise are required and to obtain them, all at your sole cost.

6.6     **Management and Personnel of Your Slender Lady Center, Training.** Your Slender Lady Center must be personally managed on a full-time basis by a person who has successfully completed all training required by us and meets all of our other then-current standards. Although we don't require it, we strongly recommend that you personally manage your Slender Lady Center on an "on-premises" basis; absentee ownership is **not** recommended by us and exposes you to a greater risk of failure than if you are personally involved, on a full time basis, in the on-site daily management of your Slender Lady Center. Training for you and one Slender Lady Center employee is included in the initial franchise fee but you'll be responsible for all travel, meals, lodging and similar costs for all persons attending training and we may charge a reasonable training fee for subsequent Slender Lady Center managers. You'll keep us advised of the identities of the manager and other supervisors of your Slender Lady Center, and we'll have the right to deal with the manager on matters pertaining to day-to-day operations of, and reporting requirements for, your Slender Lady Center. We reserve the right to review any agreements between you and your manager and to require the manager to sign confidentiality and

EXHIBIT B
(PART 2 OF 3)

other agreements acceptable to us. We strongly recommend, but do not require, that the manager of your Slender Lady Center have an equity interest and/or profit participation in your Slender Lady Center. You'll hire all employees of your Slender Lady Center and will be solely responsible for their supervision and possible termination, the terms of their employment and compensation and for the proper training of such employees in the operation of your Slender Lady Center. You'll establish and maintain at your Slender Lady Center an ongoing training program, meeting our standards, for new and continuing employees.

6.7    **Insurance.** You'll maintain in force policies of insurance issued by carriers approved by us covering various risks, as specified by us, including (but not limited to) the following: (1) comprehensive general liability insurance against claims for bodily and personal injury, death and property damage caused by, or occurring in conjunction with, your Slender Lady Center, under one or more policies of insurance containing minimum liability coverage prescribed by us from time to time; (2) all-risk property and casualty insurance for the replacement value of your Slender Lady Center and all associated items (including, but not limited to, leasehold improvements, furniture, fixtures, equipment, signs, inventory, supplies and materials); and (3) business interruption insurance providing for continued payment of all amounts due (or to become due) us and/or any affiliate of ours under this Agreement or otherwise.

We may periodically specify the types and amounts of coverage required under such insurance policies and require different and/or additional kinds of insurance at any time, including excess liability insurance.    Each insurance policy must name us, our affiliates and the Franchisor-Related Persons/Entities as additional named insured parties, will contain a waiver of all subrogation rights against us, our affiliates, the Franchisor-Related Persons/Entities and any successors and assigns, and will provide for thirty (30) days' prior written notice to us of any material modifications, cancellation or expiration of such policies.

Prior to the expiration of the term of each insurance policy, you'll furnish us with (1) a copy of each renewal or replacement insurance policy to be maintained by you for the immediately following term and (2) evidence of pre-payment of the premium. If you fail to maintain required insurance coverage, or to furnish satisfactory evidence thereof and the payment of the premiums therefor, we, in addition to our other rights and remedies hereunder, may (but aren't required to) obtain such insurance coverage on your behalf and you'll fully cooperate with us in our efforts to obtain the insurance policies, promptly execute all forms or instruments required, allow any required inspections of your Slender Lady Center, and pay to us, on demand, any costs and premiums incurred by us.

Your obligations to maintain insurance coverage will not be affected by reason of any separate insurance maintained by us, nor will the maintenance of such insurance relieve you of any obligations under this Agreement or otherwise.

6.8    **Continued Payment of Monthly Royalty Fees and Other Obligations During Closure, etc.** You and we recognize that closure of your Slender Lady Center may become necessary from time to time for remodeling, due to fire or other casualty, governmental action, shopping center or street closure, etc. Of course, if your Slender Lady Center, the Premises or any significant assets used in the operation of the franchise are damaged or become inoperable or if your Slender Lady Center is closed for any reason, you will promptly undertake all steps necessary to remedy such conditions and return your Slender Lady Center to full operation as soon as possible. If any closure of your unit takes place for any reason, you will immediately notify us, submit a plan for re-opening (with discussion of budget, deadlines, possible relocation and subject to our reasonable approval) and diligently take (at your expense) all steps necessary to fully re-open your Slender Lady Center for business as soon as possible. In any event, all financial obligations of yours to us or any affiliate, whether under this Agreement or otherwise, will remain in full force and effect during such closure and any amounts due or to become due us will continue to be paid during such closure, as specified below. Since all financial obligations of yours to us or any affiliate, whether under this Agreement or otherwise, will remain in full

force and effect even though your Slender Lady Center is closed, you will maintain business interruption insurance.

## 7.    AGREEMENT NOT TO COMPETE, CONFIDENTIALITY, ETC.

**7.1    Exclusive Relationship, Restrictions on Similar Businesses During Franchise Term and After Transfer, Termination, Expiration, Repurchase, etc.**  You and we share a mutual interest in avoiding situations where persons or companies who are, or have been, Slender Lady Franchisees operate or otherwise become involved with, a Similar Business, anywhere, either during the term of, or after the termination or expiration of your rights under, this Agreement.

This mutual interest exists since, and you and we both agree that: (1) such activities would, as a practical and realistic business matter, make use of techniques, methods, systems and procedures learned by the operator while he/she/it was a Slender Lady Franchisee, (2) the operation of a Similar Business, irrespective of location or vicinity to any existing or future Slender Lady Center, would inevitably draw on and benefit from the operator's training and experience as a Slender Lady Franchisee, including techniques not known to you or other operators prior to becoming a Slender Lady Franchisee, (3) operation of such a business, and use of any such techniques, methods, systems and procedures would damage both us and other Slender Lady Franchisees and unfairly limit reasonable expansion alternatives open to us and our Franchisees, particularly in light of the limited number of goods and services provided by us and our Franchisees and the limited number of favorable locations or areas available, thereby placing us and other Slender Lady operators at a competitive disadvantage, (4) there would be an extreme difficulty and expense involved in accurately determining actual financial impact from such activities by a current or former Slender Lady Franchisee, (5) such activities would expose us and our Franchisees to a strategy under which a person could acquire a Slender Lady franchise, learn all of our methods of doing business including innovations by other Slender Lady Franchisees, default under the franchise agreement or otherwise obtain termination or expiration and then open an unlimited number of locations drawing on their experience and training as a Slender Lady Franchisee, including access to favorable locations, (6) the possibility of such occurrences would discourage the free flow of information and innovation within the Slender Lady System, resulting in reduced growth and a decline in the value of the investments made by us and our Franchisees in Slender Lady Centers and the System, making subsequent sales or operation of Slender Lady franchises in the area of a Similar Business, or other areas, extremely difficult and placing us and our Franchisees at a disadvantage in the competitive marketplace, (7) such activities could reduce your level of time and attention given to your operation of an Slender Lady Center and thereby reduce its chances for success, and (8) such activities would constitute an unfair and inequitable method of competition with us and other Slender Lady Franchisees and is the type of behavior to which you (as a Slender Lady Franchisee) would strenuously object if engaged in by another Slender Lady Franchisee.

In addition, you acknowledge and agree that (1) you will receive valuable training and confidential information throughout the term of the Franchise, including, without limitation, information regarding our promotional, operational, sales and marketing methods and techniques and the System which was not known to you before becoming a Slender Lady Franchisee, (2) we would be unable to protect such confidential information and other information and techniques against unauthorized use or disclosure, would be unable to encourage a free exchange of ideas and information among Slender Lady franchisees and the goodwill and other assets of our business and those of other Slender Lady Franchisees would be at risk if franchise owners and members of their immediate families were permitted to hold interests in or perform services for a Similar Business during or after the term of the Franchise Agreement, (3) your ownership and/or operation of, or any other relationship with, a Similar Business would necessarily benefit from, and be inconsistent with, your status and obligations as a Slender Lady franchisee and (4) the requirements of this section have been expressly bargained for and are an express condition of our award of the Franchise to you.

You acknowledge that you've considered, as reasonable business alternatives, other franchise opportunities, as well as the possibility of your entering our industry as a non-franchised participant (in each instance not being subject to the restrictions of this Agreement), each of the restrictions on competition contained in this Agreement (including, but not limited to, those in this Section) are fair, reasonable and necessary for the protection of all members of the Slender Lady family of companies, including you and your fellow Slender Lady Franchisees and represent a reasonable balancing of the legitimate long-term interests of us, you and other Slender Lady Franchisees, will not impose any undue hardship on you, since you have other valuable opportunities, skills, experience, education and abilities unrelated to the ownership and/or operation of a Slender Lady Center and which will provide you with the opportunity to derive significant income from other endeavors, that any burden on you resulting from the enforcement of such provisions will be entirely self-inflicted and that such enforcement will, in any event, be in the public interest by avoiding diversion of business, your self-enrichment and consequent impairment of the investment made in the Slender Lady system by us and other Franchisees.

Therefore, to protect your and our investments and those of all Slender Lady Franchisees, you and we agree as follows: during the term of this Agreement (and any other Franchise Agreement with us) and any extension thereof, and for three (3) years after any transfer, repurchase, the termination (whether for cause or otherwise) of your rights, the expiration of this (or any other) Agreement (without award of a successor franchise or renewal term), and/or the date on which you cease to operate your last Slender Lady Center, whichever is later, neither you, any affiliate of yours, nor any shareholder, member or partner of yours (in the event you are or become a business entity) or any affiliate of yours, nor any member of your immediate family nor any member of the immediate family of any affiliate, shareholder or partner of yours will [except for Slender Lady Centers operated in Good Standing under franchise agreements with us]: (a) have any direct or indirect interest as a disclosed or beneficial owner in any Similar Business located, or operating units located, anywhere; (b) have any direct or indirect interest (whether through a member of the immediate family of yours or any owner of yours, or otherwise) as a disclosed or beneficial owner in any entity which is awarding franchises or licenses or establishing joint ventures or other business enterprises for the operation of Similar Businesses located, or operating units located, anywhere; (c) perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for any Similar Business or any entity which is awarding franchises or licenses or establishing joint ventures to operate Similar Businesses anywhere; or (d) directly or indirectly employ, or seek to employ, any person who is employed by us or any of the Franchisor-Related Persons/Entities or by any other Slender Lady franchisee, nor induce nor attempt to induce that person to leave said employment without the prior written consent of us and that person's employer. In any case, you will first notify us and the person's employer before taking any action with respect to any such employment and/or offer of employment. On our request, you will obtain written non-competition commitments from such persons, and in such form, as we direct.

In the event of a violation by you of any of the foregoing restrictions, our remedies will include, at our election, (i) termination of your rights and our obligations under this and all other agreements and (ii) recovery of damages and all other remedies allowed at law and/or equity which you expressly agree will include (but not be limited to) all profits generated (and which would reasonably be anticipated to be generated) in connection with the operation of any Similar Business from the initial date of violation of such restrictions through (a) three (3) years after the date we give you notice of your violation of such restrictions or (b) the date you cease to violate such restrictions, whichever comes first, such amount having been mutually agreed on by you and us in view of the extreme difficulty in accurately determining the damages suffered by us as a result of your violation (including effects on relationships with employees, customers, Slender Lady Franchisees, retraining costs, lost sales, etc.) and your and our mutual interest in avoiding a lengthy and costly dispute over damages, and, in addition, you (and each affiliate of yours, together with each owner of you, if you are a business entity, and/or any affiliate of yours) will execute, in a form prescribed by us, a general release, of any and all claims, liabilities and/or obligations of any nature whatsoever, however arising, known or unknown against us and/or any or all of the Franchisor-Related Persons/Entities. Calculation of the profits to be recovered by us will exclude any costs not reasonably appropriate to the operation of the

Similar Business.   You confirm that prior to entering into the franchised business you possessed (and still possess) valuable skills unrelated to the franchised business, have the ability to be gainfully employed in other fields entirely acceptable to you and that the strict enforcement of the restrictions of this Agreement will not work any undue or significant hardship on you or your family.

If any of the restrictions of this Section are determined to be unenforceable due to excessive duration, geographic scope, business coverage or otherwise, you and we agree that they will be reduced to the level that provides the greatest restriction but which is still enforceable, notwithstanding any choice-of-law or other provisions in this Agreement to the contrary.   The time period of the competitive restrictions described in this Agreement will be extended by the length of time during which you or any other person or entity are in breach of any provision of this Agreement (including the limitations of this Section).   The provisions of this Section will continue in full force and effect through the extended time period.

The restrictions of this Section don't apply to the ownership of shares, of a class of securities listed on a stock exchange or traded on the over-the-counter market, that represent less than three percent (3%) of the number of shares of that class issued and outstanding.

If you violate any obligations under this Agreement (or otherwise) with respect to a Similar Business, our remedies will include (but are not limited to) the right to obtain a temporary restraining order, preliminary and/or permanent injunction (or other equitable relief), notwithstanding any provisions of this Agreement to the contrary.

On our request, you will obtain written non-competition commitments from the persons subject to the non-competition provisions of this Agreement, in such form as we direct and naming you and us as beneficiaries of such agreements.

If the restrictions of this Section are unenforceable or are reduced to a level which we, in our sole and absolute discretion, find unacceptable, we may, in addition to any other remedies available to us, require you to pay a fee (either paid immediately on a present value basis or over time, as we select) of ten percent (10%) of your gross revenues with respect to any activities in violation of this Agreement, for three (3) years, such amount having been jointly selected by you and us as fair and appropriate damages and in consideration of (1) the difficulty of accurately predicting actual damages, (2) the fact you will inevitably benefit in the operation of such business from your training and experience as a Slender Lady Franchisee, (3) the possible impact on the expansion and operation of our system, including the expense and difficulty of a sale of a franchise in your area and (4) you not having any rights, nor we having any obligations, under this Agreement or otherwise during such period.

7.2    **Confidential Information - Non-Disclosure and Non-Use.**  We have, and plan to develop and acquire from time-to-time, certain confidential and proprietary information and trade secrets relating to Slender Lady Centers and other matters and which constitutes the "Confidential Information," including but not necessarily limited to the following categories: (1) methods, techniques, specifications, standards, policies, procedures, information, concepts, systems and knowledge of and experience in the development, operation and franchising of Slender Lady Centers; (2) marketing  programs for Slender Lady Centers; (3) specifications for, and suppliers of, certain materials, equipment, furniture and fixtures for Slender Lady Centers; (4) methods, procedures and techniques for preparing, marketing and presenting the Products and Services; and (5) information regarding the Products and Services authorized to be offered from Slender Lady Centers. In any dispute between you and us involving any question as to whether or not certain information is, in fact, confidential and/or proprietary to us, or any related issues, the burden of proof and the burden of going forward will be on you.

We'll disclose to you, during training, in the Manuals and in guidance and assistance furnished to you during the term of the Franchise, parts of the Confidential Information needed for the operation of a Slender Lady Center, and you may learn additional Confidential Information of ours during the term of

the Franchise. You will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of a franchised Slender Lady Center at the Premises and pursuant to this Agreement.

You acknowledge and agree that the Confidential Information is a valuable asset of ours, includes trade secrets of ours and will be disclosed to you solely on the condition that you will forever: (1) not use the Confidential Information in any way other than the operation of your Slender Lady Center under a Franchise Agreement in Good Standing with us; (2) maintain the absolute secrecy and confidentiality of the Confidential Information during and after the term of this Agreement; (3) not make unauthorized copies of any portion of the Confidential Information; and (4) adopt and implement all reasonable procedures prescribed by us from time to time to prevent unauthorized use or disclosure of, or access to, the Confidential Information. Specifically, you will not sell, rent or allow anyone to use any list of customers (such list being part of the Confidential Information and our property) other than in connection with the mailing of advertising materials approved by us for your Slender Lady Center. You agree that any unauthorized use or duplication of any part of the Confidential Information, including in any other business, would be an unfair method of competition with us and other Slender Lady operators.

So as to assist in the development of the Slender Lady System and for the mutual benefit of all Slender Lady operators, we'll have the perpetual right to use and to authorize those we designate and/or other Slender Lady Centers to use, and you'll fully and promptly disclose to us all ideas, concepts, methods, techniques and otherwise relating to the development, marketing, operation and/or otherwise of a Slender Lady Center or which would be usable therein, which are conceived or developed by you and/or your employees during the term of this Agreement, in each case without compensation or other obligation.

You'll cause each of your employees, agents, principals and affiliates to execute and deliver to you an agreement containing substantially the same provisions as set forth in this Section, in a form or forms consented to by us. An original of each executed Confidentiality Agreement will be available for our inspection during business hours. You will, on our request, deliver to us copies of any Confidentiality Agreement.

8. <u>INITIAL FRANCHISE, MONTHLY ROYALTY, MARKETING FUND FEES</u>

8.1    <u>Initial Franchise Fee</u>.
In consideration of the franchise granted in this Agreement by Franchisor to Franchisee, Franchisee shall pay to Franchisor the sum of Twenty Nine Thousand Nine Hundred Dollars ($29,900). If the franchise granted in this Agreement to Franchisee constitutes a second or subsequent unit within a period of 18 months from the opening of Franchisee's initial or prior Slender Lady Center, Franchisee will pay a discounted franchise fee of Twenty Four Thousand Nine Hundred Dollars ($24,900) for each such second or subsequent Slender Lady Center.

If Franchisee, using Franchisee's best efforts is unable to open the Center within the specified time limits for reasons beyond Franchisee's control, (as determined in Franchisor's sole and absolute opinion) the above-mentioned initial franchise fee shall be refunded to Franchisee, except that Franchisor shall retain the sum of not to exceed Ten Thousand Dollars ($10,000.00) to compensate it for reasonable expenses incurred in connection with this Agreement on condition that all items furnished the Franchisee by Franchisor are first returned in the condition in which they were delivered, and you will return all manuals and you (and each affiliate of yours) will execute documentation providing for a general release, in a form prescribed by us, of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, <u>known or unknown</u>, against us and/or any or all of the Franchisor-Related Persons/Entities and we will provide you with a similar release, except that your indemnity, non-competition and confidentiality obligations and the dispute avoidance and resolution provisions of this Agreement, including those of Article 15, together with the provisions of Article 20, will be preserved.

**8.2    Monthly Royalty Fee**.  Franchisee shall also pay to Franchisor a monthly Royalty Fee according to the following schedule:

| Year of the Term of the Franchise | Amount of Monthly Royalty Fee |
| --- | --- |
| First Year | $395.00 |
| Second Year and after | $495.00 |

Monthly Royalty Fees are due and payable on or before the first day of each month throughout the term of the Agreement by pre-authorized electronic bank draft, and is subject to adjustment for inflation.  The Royalty Fee shall commence upon the opening of franchisee's business to the general public, and shall be pro-rated for the first month based on the actual number of days that Franchisee shall be open to the public.

Any monthly Royalty Fee that is more than five days late shall incur a late fee of Fifty Dollars ($50.00) for each month that said fee is late.  The Royalty Fee is not refundable, with the exception of any fees that may have been overpaid to Franchisor in error by franchisee.  In the event such late fee exceeds the amount of such fees allowed to be paid under applicable law, the amount of such late fee shall be reduced to the maximum amount so allowable.

**8.3    Marketing Fund - Local Center Advertising.**

Marketing Fund.  We may, in our sole and absolute discretion, institute an advertising, publicity and marketing fund (the "Marketing Fund") for such advertising, advertising-related, marketing and/or public relations programs, services and/or materials as we may deem necessary or appropriate to promote current and/or future Slender Lady Centers and the Brand.  The Marketing Fund (or any similar Marketing Fund instituted by us at any later date) may be combined with any marketing fund otherwise established for Slender Lady Centers and the funds merged for use in accordance with this Agreement and may be operated on a national, regional, local or other basis, in our sole and absolute discretion. You agree to contribute to the Marketing Fund.  All Slender Lady Centers owned by us will be obligated to make contributions to the Marketing Fund.  You understand that, due to differing forms of Franchise Agreements or otherwise, some Slender Lady Franchisees may have different Marketing Fund and/or other obligations than in this Agreement.  YOUR CONTRIBUTION TO THE MARKETING FUND, IF INSTITUTED, WILL NOT EXCEED $495 PER MONTH.

We'll have sole and absolute discretion over all matters relating to the Marketing Fund in any way, including (but not limited to) its management, all financial matters, expenditures, receipts and/or investments by the Marketing Fund, timing of expenditures, creative concepts, content, materials and endorsements for any marketing programs together with the geographic, market and media placement and allocation thereof.  The Marketing Fund may be used to (among other things) pay costs of marketing programs (including public relations), "brand/image advertising" and other marketing programs, new product development, signage, preparing, producing, distributing and using marketing, advertising and other materials and programs; administering national, regional and other marketing programs, purchasing media, employing advertising, public relations and other agencies and firms; and supporting public relations, market research and other advertising and marketing activities to promote current and/or future Slender Lady Centers and the Brand, as well as any expenses associated with any Marketing Advisory Council(s) and/or Franchisee Advisory Council(s) if those Councils, and such expenses, are approved by us in our sole and absolute discretion.  A brief statement regarding information on the availability of Slender Lady franchises may be included in advertising and other items produced and/or distributed using the Marketing Fund.

Without approval, we can arrange for goods, services, materials (including administrative

services), related to the purposes and activities of the Marketing Fund, to be provided to the Marketing Fund, by ourselves, and/or, any affiliate of ours (such as an "in-house advertising agency"). We may use the Marketing Fund to reasonably compensate and reimburse any such providers for goods, services, materials, (including administrative services) rendered to the Marketing Fund  While we are not required to submit any proposed or other expenditures by (or any other matters relating to) the Marketing Fund for approval by any Franchisee Advisory Council, if we do submit any matters for approval and approval is granted by a majority of such Franchisee Advisory Council, such approval will be final and binding on you. In any event, the Marketing Fund will be accounted for separately from our other funds and may be used to pay any and/or all administrative and other costs of the Marketing Fund related to its activities and purposes and/or as authorized by the relevant Franchise Agreements.

You'll participate in all marketing programs instituted by the Marketing Fund or us but will retain full freedom to set your own prices, except that we may, to the greatest degree permitted by applicable law, specify maximum prices above which you will not sell or otherwise provide any goods or services and you will comply with all such maximum prices. You will fully honor all coupons, price reduction and other promotions/programs as issued/designated by us. The Marketing Fund will, as available, furnish you with marketing, advertising and promotional formats and sample materials and may charge the direct cost of producing them plus shipping and handling. We may, in our sole and absolute discretion, use the Marketing Fund to pay the costs of advertising, advertising-related, marketing and/or public relations programs, services and/or materials with respect to locations, programs or concepts where products and/or services offered under the Marks are to be offered in conjunction with products and/or services offered under other marks, including (but not limited to) any co-branding, dual franchising or other programs, and any other franchised or non-franchised alternative channel of distribution, whether controlled by us or not.

The Marketing Fund will not be used to defray any of our general operating expenses, except for such salaries, administrative costs, overhead and other expenses as we may reasonably incur in activities related to the Marketing Fund and its programs  All taxes  incurred in connection with or related to the Marketing Fund, its activities, contributions to the Marketing Fund and/or otherwise, whether imposed on us, the Marketing Fund or otherwise, will be the sole responsibility of the Marketing Fund. We may charge the Marketing Fund for attorney's fees and other costs related in any way to our defense of any claims against us and/or any of the Franchisor-Related Persons/Entities regarding the Marketing Fund (including, but not limited to, our management of the Marketing Fund) or with respect to collecting amounts due and/or expenditures by or from the Marketing Fund. We may, in our sole and absolute discretion, spend in any fiscal year an amount greater or less than the aggregate contributions to the Marketing Fund in that year and the Marketing Fund may borrow from us or other lenders to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus for future use by the Marketing Fund. We will pay Marketing Fund expenditures  from Marketing Fund resources in the following order: first, from any contributions made by any supplier; second, from any earnings on assets held by the Marketing Fund; third, from any contributions made by us; and finally from any contributions made by Franchisees. You agree that neither we (nor any of the Franchisor-Related Persons/Entities) will be liable for any act or omission, whether with respect to the Marketing Fund or otherwise which is consistent with this Agreement or other information provided to you.

If you are in default of any of your obligations to us, the Franchisor-Related Persons/Entities and/or the Marketing Fund, or your Franchise Agreement is otherwise subject to termination, you will have no rights, and we will have no obligations to you, under the Marketing Fund (and/or related) provisions of this Agreement. We may deny access to any and all programs and/or materials created by, and benefits of, the Marketing Fund to Franchisees who are in default in any obligations to the Marketing Fund.

Local Center Advertising. Prior to use by you, samples of all advertising and promotional materials and programs (including any use of the Internet, World Wide Web and/or other electronic

media) not prepared or previously approved by us must be submitted to us, in the form and manner prescribed by us from time to time, for our review and consent, which we may withhold or condition as we see fit in our sole and absolute discretion. If written disapproval is not received by you within fifteen (15) days from the date of receipt by us of such materials, we will be deemed to have given the required consent but we can later retract any consent (whether express or as a result of such failure to respond) by notice to you. You won't use any advertising or promotional materials or programs that we have disapproved or that does not include the copyright, trademark and other notices required by us. We can require that a brief statement regarding the availability of information regarding the purchase of Slender Lady franchises may be included in all advertising used by you and that a brochure regarding purchase of Slender Lady franchises be placed in a prominent location in your Slender Lady Center.

    **8.4**    **Electronic Funds Transfer.** You must participate in our then-current electronic funds transfer program with a vendor of our choice (who may be us or an affiliate), whether for payment of membership dues and/or other amounts owed to you, and/or for amounts owed by you and/or any affiliate of yours to us, any affiliate of ours and/or any vendor as approved by us, authorizing us to utilize a pre-authorized bank draft system on a monthly basis (or otherwise as we specify from time to time in our sole and absolute discretion). All amounts due to us (or any affiliate) for each period must be received by us (and such affiliate) or credited to our (or our affiliate's) account by pre-authorized bank debit before 5:00 p.m. on the due date or other time specified by us. You will also participate in our then-current electronic reporting system covering sales and other items.

    If we ever have the right to cancel or terminate your Franchise, any rights-of-first-refusal and/or territorial rights, whether under the provisions of Section 13.3 or otherwise, in addition to any other rights held by us, we can require that all membership dues (and other amounts due from members, customers or otherwise) be paid directly to us, electronically or otherwise, with us remitting, within 30 days after the close of each month, net amounts due you . All amounts owed to you, including, without limitation, membership dues, will be transferred along with any other amounts due us (or any affiliate) for each period. All such funds due must be received by us (and any such affiliate) or credited to our (or our affiliate's) account by pre-authorized bank debit before 5:00 p.m. on the due dates specified for each such amount, or other point in time specified by us. You will also participate in our then-current electronic reporting system covering sales and other items.

    **8.5**    **Inflation Adjustments.** Where so designated in this Agreement with respect to certain amounts, such amounts will be adjusted each year, in proportion to the changes in the Consumer Price Index (U.S. Average, all items) maintained by the U.S. Department of Labor (or such equivalent index as may be adopted in the future) as compared to the previous year. We will notify you of the percentage adjustment each year.

## 9. LATE PAYMENTS AND REMEDIES

    **9.1**    Any Royalty Fee that is more than five (5) days late shall incur a late fee of Fifty Dollars ($50.00) and any Advertising Fee that is more than five (5) days late shall have a late fee of Fifty Dollars ($50.00) per month.

    **9.2**    Franchisee acknowledges and agrees that non-payment of any Royalty Fee or Advertising Fee shall:

        9.2.1    Be a Material breach of this Agreement; and

        9.2.2    Entitle Franchisor to claim for general damages for breach of contract.

    **9.3**    No claim by Franchisee that Franchisor is in default under any provision hereof shall be a defense to a claim by Franchisor for Royalty Fees, Marketing Fund Contributions, or other amounts owing hereunder.

**9.4** Franchisee agrees that it will not, on the grounds of the alleged nonperformance by Franchisor of any of its obligations hereunder, withhold payment of any amounts due to Franchisor.

## 10.    RECORDS AND FINANCIAL INSPECTION

### 10.1    Records

10.1.1 Franchisee shall furnish to Franchisor (electronically as may be designated by Franchisor from time to time) data and/or reports, in a form satisfactory to and as prescribed by Franchisor. Such data and/or reports for the each month will be submitted for receipt by Franchisor on or before the tenth (10th) day of the following month.

10.1.2 Franchisee shall keep true and correct business records and books of account and shall establish and maintain such records in accordance with methods and procedures recommended by Franchisor. Franchisee will obtain and use required management and business data software as designated by Franchisor from time to time.

10.1.3 Franchisee will furnish Franchisor with a profit and loss statement and balance sheet for the preceding month on or before the tenth day of each month for the Franchisee's Slender Lady Center, prepared, verified and signed by the Franchisee.

### 10.2    Franchisor's Inspection, etc.

10.2.1 We and/or our agents will have the right, at any time during business hours, and without prior notice to you, to: (1) inspect the Premises, the Designated Equipment and other equipment, furniture, fixtures, signs, operating materials and supplies; (2) observe, photograph and videotape (or otherwise record) the operations of your Slender Lady Center for such periods as we deem necessary in our sole and absolute discretion; (3) remove samples of any items for testing and analysis; (4) interview personnel of your Slender Lady Center; (5) interview customers and employees of your Slender Lady Center; (6) inspect and/or conduct, supervise or observe a physical count of, the inventory and assets of your Slender Lady Center; and (7) inspect and copy any books, records, documents or otherwise relating to your Slender Lady Center. You'll cooperate fully with us in connection with such matters. You'll present to your customers such evaluation forms as are periodically prescribed by us and will participate and/or request your customers to participate in any surveys performed by or on behalf of us.

10.2.2 Upon request by Franchisor, Franchisee shall promptly furnish to it copies of social security reports, state and federal unemployment reports, federal income tax returns, state income, franchise or other tax returns, and such other federal, state, county or city reports as may be requested.

## 11.    OPERATIONS PROCEDURE

**11.1    Facilities.** Franchisee shall operate the Franchise business in accordance with Section 3.2.4 and shall keep and maintain a safe, neat, clean and orderly facility at a location in keeping with the standards established in Franchisor's training manuals. ~~The regular hours of operation are from 8:00 a.m. to 1:00 p.m. and 4:00 p.m. to 8:00 p.m., Monday through Friday, excluding holidays.~~ *WE RECOMMEND THAT YOU OPERATE YOUR SLENDER LADY CENTER AT LEAST 45 HOURS PER WEEK.*

**11.2    Office Supplies.** To maintain uniformity within Franchisor's system and to maintain the standard practices that are necessary to promote the good will of Franchisor's system, Franchisee shall use in the operation of its business only the standard form of reports, stationery and printed material uniformly prescribed by Franchisor for use by members of its system. Franchisee may at its discretion

purchase all such materials from Franchisor. The charge for such material if ordered from Franchisor, together with all costs for postage and handling, shall be paid in advance by Franchisee. Franchisor reserves the right to prohibit Franchisee from using any form of reports, stationery or printed matters purchased from other suppliers that deviate in any way, either in content or in the standards of quality that have been established by Franchisor in the past or may be established by Franchisor in the future.

**11.3    Advertising.** Franchisee shall place, at Franchisee's cost, in the yellow pages of the telephone directory serving its market area, advertisement(s) as prescribed by Franchisor in the Confidential Operations Manual. Additional yellow page advertisements may be placed by Franchisee, but only in the most recent form prescribed by Franchisor.

**11.4    Initial Advertising/Marketing.** During the 90 day period prior to opening your Center, you'll spend an amount designated by us [which will not be less than One Thousand Five Hundred Dollars ($1,500) nor more than Three Thousand Dollars ($3,000)] on an initial advertising/marketing program, which will only use marketing, advertising and public relations programs, media, materials, promotional items, and vendors approved in advance by us. We may require you to pay these amounts directly to vendors approved by us. We'll furnish advice and guidance to you with respect to the program, the use of trademark and copyright notices, discounts, and general guidelines all of which you agree to follow.

## 12.    MARKS

**12.1    Goodwill and Ownership of Marks.** Your right to use the Marks is derived solely from this Agreement and is limited to the operation of a single Slender Lady Center by you, at a location consented to by us, in compliance with this Agreement and all applicable standards, specifications and procedures prescribed by us. You'll use the Marks only as expressly authorized by us. You won't oppose, or engage in any acts or omissions inconsistent with, our rights in and to the Marks. Any unauthorized use of the Marks by you is a breach of this Agreement and an infringement of our rights in and to the Marks. This Agreement, and your operation of your Slender Lady Center, does not confer any goodwill or other interests in the Marks on you (other than the right to operate your Slender Lady Center in compliance with this Agreement), all goodwill (whether relating to the Marks or otherwise) and such interests belonging exclusively to us. All provisions of this Agreement applicable to the Marks will apply to any other trademarks, service marks and commercial symbols whenever authorized for use by, and licensed to, you by us. Any marks or other forms of identification developed by us in the future will remain our property and you will have no rights in or to them but we may require you to use them as we direct. You agree that if you breach any obligation regarding the Marks, we would have no adequate remedy at law and that we will be entitled to equitable relief with respect to any such breach. Your rights to the Marks are non-exclusive, are only as set forth in this Agreement, and we retain the sole right to grant other licenses for the Marks (in addition to those already granted) and to establish and/or become involved with other, similar and/or related businesses and to grant them rights with respect to the Marks without providing you with any rights.

**12.2    Limitations and Use of Marks.** Unless we direct or consent (in writing) otherwise, you will use the Marks as the sole identification in connection with your Slender Lady Center, provided that you'll identify yourself as the independent owner of your Slender Lady Center as prescribed by us. You will not use any Mark as part of any corporate or trade name or as your primary business name or with any prefix, suffix, or other modifying words, terms, designs or symbols, or in any modified form (For example, you wouldn't use "Slender Lady of Alabama, Inc." or "Smith's Slender Lady."). You won't use any Mark in connection with the performance or sale of any unauthorized services or products or at any location or in any other manner not expressly authorized in writing by us. The use of any geographic or other designation in connection with the Marks will be only as permitted by us, you will have no exclusive or other rights with regard to any geographic or other designation and you will not take any action

inhibiting or otherwise affecting the use of the Marks by any Slender Lady Center Franchisee or anyone else, unless expressly authorized by us in writing. You'll display the Marks prominently as we require (including copyright, trademark and other notices) at your Slender Lady Center and in connection with advertising and marketing materials and you won't use any of the Marks so as to negatively affect the goodwill associated with the Marks. You won't provide any goods or services from your Slender Lady Center or otherwise under any identification or tradename, other than the Marks. You'll give such trademark and other notices as we direct and will, at your expense, obtain fictitious or assumed name registrations as may be required under law. You'll sign such documents and act as required by us from time to time in order to protect our interests in the Marks and you won't take any action, or omit to take an action, so as to jeopardize our interests or the validity or enforceability of the Marks.

12.3    **Notification of Infringements and Claims.**  You'll immediately notify us of any apparent or actual infringement of, or challenge to, your use of any Mark, or any claim by any person of any rights in any Mark, and you won't communicate with anyone other than us and our counsel in connection with any such matter. We'll have sole and absolute discretion to take such action as we deem appropriate in connection with such (or any related) matters, and the right to control exclusively any settlement, litigation or Patent and Trademark Office or other proceeding arising out of or related to any such matters or otherwise relating to any Mark. You'll execute any and all instruments and documents, render such assistance, and do such acts and things as may, in our opinion, be advisable to protect and maintain our interests in any litigation or other proceeding or to otherwise protect and maintain our interests in the Marks.

12.4    **Discontinuance of Use of Marks.**  If it becomes advisable at any time in our sole and absolute discretion for you to modify or discontinue the use of any of the Marks or use one or more additional or substitute trademarks or service marks, you will promptly comply (at your sole expense) with our directions to modify or otherwise discontinue the use of such Marks, or use one or more additional or substitute trademarks or service marks, including (but not limited to) replacement of all signage, etc. We won't have any liability or obligation (whether of defense, indemnity, expense reimbursement or otherwise) to you, and you agree to make no claim for, or in connection with, any modification, discontinuance or otherwise, and/or any dispute regarding the Marks and/or your and/or our rights in or to them. We make no guaranty that a modification, discontinuance or otherwise may not be required, whether as a result of expiration, termination or limitation of our rights to the Marks or otherwise.

You understand that there is always a possibility that there might be one or more businesses, similar to the business covered by the Franchise, operating in or near the area(s) where you may do business or otherwise, using a name and/or marks similar to ours and with superior rights to such name and/or marks as a result of prior use or otherwise. We strongly urge you to research this possibility, using telephone directories, local filings and other means, prior to your signing this Agreement or any other documents, expending or paying any sums or making any commitments and you understand that if you fail to do so, you're at risk.

## 13.    **TERMINATION OF THE FRANCHISE**

13.1    **Defaults with No Right to Cure.**  Your rights and our obligations under this Agreement will automatically terminate on delivery [or, in any event, in three (3) calendar days after mailing] of notice of termination to you (without further action by us and without opportunity to cure) if: (1) you or any of your owners fail, in the time provided in, or otherwise in accordance with, this Agreement to: (a) locate a site accepted by us; (b) obtain lawful possession of the Premises; or (c) develop and open your Slender Lady Center; (2) you or any of your owners abandons or fails to operate your Slender Lady Center for five (5) calendar days or more, or surrenders or transfers control without our prior written approval; (3) you or any of your owners has made any material misrepresentation or omission in your application for the Franchise, including (but not limited to) failure to disclose any prior litigation or criminal convictions

(other than minor traffic offenses); (4) you or any of your owners is judged bankrupt, becomes insolvent, makes an assignment for the benefit of creditors, is unable to pay his or her debts as they become due, or a petition under any bankruptcy law is filed against you or any of your owners or a receiver or other custodian is appointed for a substantial part of the assets of your Slender Lady Center; (5) you or any of your owners is convicted by a trial court of, or pleads no contest to, a felony, or to any crime or offense that may adversely affect the reputation of the Franchisee or any owner or your Slender Lady Center or the goodwill associated with the Marks or engages in any misconduct which unfavorably affects the reputation of the Franchisee or any owner or your Slender Lady Center, us or the goodwill associated with the Marks (including, but not limited to, child abuse or other mistreatment, health or safety hazards, drug or alcohol problems or allowing unlawful activities or unauthorized or illegal items to be used or distributed at the Premises or in connection with the Franchise); (6) you or any of the Franchisee's owners makes an unauthorized "transfer" as defined in this Agreement; (7) you or any of the Franchisee's owners makes any unauthorized use or disclosure of or duplicates any copy of any Confidential Information, makes any unauthorized use of the Marks, or uses, duplicates, or discloses any portion of the Manuals or you and/or any other person/entity violates any restriction on ownership, operation, etc. of a Similar Business; (8) you or any of the Franchisee's owners loses the right to possession of the Premises and does not relocate your Slender Lady Center to other premises in accordance with this Agreement; (9) you [and/or any of your owners (and/or any affiliate of you and/or any affiliate's owners)] make any misrepresentation to us or any affiliate, including (but not limited to) any misrepresentation of Gross Volume and/or any amounts due us and/or any affiliate and/or commit any other act or omission constituting fraud, misrepresentation or similar act or omission, whether with respect to us, any of the Franchisor-Related Entities and/or any third party (you agree that any fraud, misrepresentation or similar act or omission by you, etc. is by its nature incurable, since it would adversely affect the goodwill associated with the Marks and/or irrevocably damage the relationship between you and us); (10) you (and/or any owner and/or affiliate of yours) engage in any legal action (including arbitration, but not including mediation) against us and/or any of the Franchisor-Related Persons/Entities and do not receive a final judgment or award substantially in your favor on the merits; (11) there are five or more customer complaints with respect to your Slender Lady Center in any 60-day period, whether or not resolved, and/or (12) you are substantially unable to cooperate with us and/or other Franchisees, or there exists an incompatibility of character or personality, and/or the presence of substantial discord or disruption on your part, in each case as determined by us in our reasonable discretion; (13) you fail to comply with our Terms of Use and/or Privacy Policies (and/or any other requirements) regarding all computer and other systems, including (but not limited to) Internet use; and/or (14) you have failed to retain (or otherwise fail to produce on request) any records required to be maintained by our record retention policy or otherwise are required for us to confirm your compliance with the provisions of this (or any other) agreement. In the case of defaults (10) and (12), you will be allowed 60 days after notice of termination to transfer the Franchise and the Franchised Business.

**13.2    Defaults with Right to Cure.** Your rights and our obligations under this Agreement will automatically terminate on our mailing of notice of termination to you (without further action by us and without further opportunity to cure beyond that set forth in this section), if you, any of the Franchisee's owners or any affiliate of any of the foregoing:

### 10 Day Cure

(1)    fail to report accurately the Gross Volume of any Slender Lady Center (or fail to submit, in fully accurate and complete form and when required, any other report due under this Agreement, any lease/sublease or otherwise) or fail to make payments of any amounts due us, any affiliate and/or any supplier/creditor of yours and do not correct such failure within ten (10) calendar days after written notice is mailed to you;

### 30 Day Cure

(2)      cause or permit to exist any default under the lease or sublease for the Premises and fail to cure such default within the applicable cure period set forth in the lease or sublease; fail to remain current in your obligations to taxing authorities, landlords, equipment lessors, suppliers or others; or fail to comply with any other provision of this Agreement (or any other agreement with us and/or any affiliate of ours) or any specification, standard or operating procedure or rule prescribed by us (including reporting requirements) not providing for a shorter notice period; and, in any such case, do not: (a) correct such failure within thirty (30) calendar days after written notice of such failure to comply is mailed to you; or (b) if such failure cannot reasonably be corrected within such thirty (30) day period, undertake within thirty (30) calendar days after such written notice is mailed to you, and diligently continue until completion, efforts to bring your Slender Lady Center into full compliance and furnish, at our request, proof acceptable to us of such efforts and the date full compliance will be achieved; provided that, in any event, such defaults must be fully cured within ninety (90) calendar days after such written notice is mailed to you.

13.3    **Repeated Defaults.** Your rights and our obligations under this Agreement will terminate immediately upon notice to you and without opportunity to cure, if you or any affiliate defaults on two (2) or more separate occasions within any period of twelve (12) consecutive months, or on three (3) or more separate occasions within any period of twenty-four (24) consecutive months, in any obligation (whether the same or different), whether under this Agreement, any other agreement with us and/or any of our affiliates, the Manuals or otherwise, whether or not such defaults are timely corrected.

If you (and/or any affiliate) have (a) defaulted on two (2) or more separate occasions within any period of twelve (12) consecutive months, or on three (3) or more separate occasions within any period of twenty-four (24) consecutive months, in any obligation(s) (whether the same or different), whether or not such defaults are timely corrected, or (b) have committed any default, or  have violated any obligation to us and/or any of the Franchisor-Related Persons/Entities, which is incurable or (c) have committed any default, or  have violated any obligation to us and/or any of the Franchisor-Related Persons/Entities, which remains uncured after any applicable cure period, whether under this Agreement, any other agreement with us and/or any of our affiliates, the Manuals or otherwise, then we may cancel all of your rights-of-first-refusal, and/or any other territorial or similar rights, whether arising under this Agreement, any other agreement and/or otherwise.

13.4    **Cross-Defaults, Non-Exclusive Remedies, etc.** Any default by you (or any person/company affiliated with you) under this Agreement may be regarded as a default under any other agreement (including, but not limited to, any lease and/or sublease) between you (or any affiliate of yours) and us (or any affiliate of ours). Any default by you (or any person/company affiliated with you) under any other agreement (including, but not limited to, any lease and/or sublease) between us (or any affiliate of ours) and you (or any person/company affiliated with you), or any default by you (or any person/company affiliated with you) under any obligation to us (or any affiliate of ours), may be regarded as a default under this Agreement. Any default by you (or any person/company affiliated with you) under any lease, sublease, loan agreement, security interest or otherwise, whether with us, any affiliate of ours and/or any third party, may be regarded as a default under this Agreement and/or any other agreement between us (or any affiliate of ours) and you (or any affiliate of yours).

In each of the foregoing cases, we (and any affiliate of ours) will have all remedies allowed at law, including termination of your rights (and/or those of any person/company affiliated with you) and our (and/or our affiliates') obligations. No right or remedy we may have (including termination) is exclusive of any other right or remedy provided under law or equity and we may pursue any rights and/or remedies available.

13.5    **Our Right To Discontinue Providing Products To You After Issuance of Notice of Default.** If we issue a notice of default, we and each of our affiliates will have the right, in addition to our other rights and remedies, to discontinue selling and/or providing any goods and/or services to you until

you have cured all defaults and we and/or our affiliates may cease providing such items to you or require you to pay C.O.D. (i.e., cash on delivery) by certified check until such time as you correct this problem.

## 14.    PROCEDURES UPON TERMINATION, TRANSFER, REPURCHASE AND/OR EXPIRATION OF THE FRANCHISE OR OTHERWISE

14.1    **Termination of Rights and Obligations, Payments of Amounts Owed, etc.**  Transfer, repurchase, termination or expiration of this Agreement will constitute a termination or expiration of all of your rights and all of our obligations. You'll pay us and each of our affiliates, within ten (10) days after the effective date of any transfer, repurchase, termination or expiration of the Franchise, or such later date that the amounts due are determined, such Royalty Fees, marketing contributions, amounts owed for purchases or otherwise by you (or any affiliate) from us and/or any affiliate, interest due on any of the foregoing, and all other amounts owed to us (or any affiliate) which are then unpaid. On transfer, repurchase, termination or expiration of this Agreement, and/or if we ever have the right to cancel or terminate your Franchise, any rights-of-first-refusal or territorial rights, whether under the provisions of Section 13.3 or otherwise, you will, on request by us, transfer to us (or our designee) possession and ownership of all exercise equipment and accessories used in connection with the franchised business, with us paying the depreciated fair market value thereof, net of any amounts owed or to be owed to us and/or any affiliate of ours and/or approved vendor.  In the event of any dispute regarding the net depreciated fair market value of such items or otherwise relating to our rights under this section, you will immediately transfer possession of such items to us (or our designee) pending resolution of such dispute in accordance with the provisions on dispute avoidance and resolution of this Agreement.

14.2    **Marks, Trade Dress, Phone Listings, etc.**  After any transfer, repurchase, termination or expiration of the Franchise, you will: (1) not directly or indirectly at any time or in any manner identify yourself or any business as a current or former Slender Lady Center, or as a current or former franchisee of or as otherwise associated with us, or use any Mark or any colorable imitation thereof in any manner or for any purpose, or utilize for any purpose any trade name, trademark or service mark or other commercial symbol that suggests or indicates a connection or association with us; (2) remove all signs containing any Mark and return to us or (at our option) destroy all forms and materials containing any Mark or otherwise identifying or relating to a Slender Lady Center; (3) take such actions as may be required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark; (4) if you retain possession of the Premises, you will, at your expense, make such modifications and alterations, including removal of all distinctive signage, appearance, physical and structural features associated with the Trade Dress of Slender Lady Centers, as may be necessary or appropriate to distinguish the Premises clearly from its former appearance and from other Slender Lady Centers as to prevent any possibility that the public will associate the Premises with Slender Lady Centers and any confusion created by such association, and (5) take all actions necessary or appropriate to transfer any telephone number(s), and any telephone directory listings, associated with the Marks and/or your Slender Lady Center(s) to us [including home page, cellular and fax numbers, directory listings, internet or similar connections (including all rights to any "home page" developed and/or used by you) and/or advertising with respect to, and/or used in connection with your Slender Lady business and/or associated with the Marks].    We own your client memberships and/or the list of your customers, and may use such memberships and/or list in any way we wish, both before and after any termination, expiration, repurchase or otherwise.

15.  **ACKNOWLEDGMENTS AND REPRESENTATIONS, ENTIRE AGREEMENT, NO FIDUCIARY RELATIONSHIP, ETC.**

> MAKE SURE YOU READ THE FOLLOWING SECTIONS CAREFULLY! THEY'RE IMPORTANT AND ARE IN THIS AGREEMENT TO BE CERTAIN THAT NEITHER YOU NOR WE HAVE ANY MISUNDERSTANDINGS OR INAPPROPRIATE EXPECTATIONS.

You and we agree that there does not exist, and there will not be, any fiduciary, trust or similar special relationship between you and us, that no such or similar relationships are intended by you or us and you and we expressly disavow any such or similar relationships, that the relationship between you and us is an ordinary commercial relationship between independent businesspeople intended for mutual but independent economic benefit and is not in any sense, nor is intended to be, a fiduciary, trust or similar special relationship, that each party has dealt with each other at arm's length and as businesspersons with equivalent bargaining power, notwithstanding the relationship of Franchisor and Franchisee, and that you have alternative business opportunities (some of which are franchised) which you have investigated and in which you can invest.

You acknowledge that you [and each of your owners (if you are a corporation or partnership) and investors] has read this Agreement and our Uniform Franchise Offering Circular and all exhibits and that you and they understand and accept the terms, conditions, and covenants contained in this Agreement as being necessary to maintain our high standards of quality and service and the uniformity of those standards at all Slender Lady Centers and to protect and preserve the goodwill of the Marks and the System.

You and we, each agreeing on the critical practical business importance of our relationship being governed solely by written documents signed by you and us (including any concurrently executed written personal guarantees Statement of Prospective Franchisee and/or exhibits - schedules - addenda - promissory note(s) - security agreement(s) or other written documents signed by the party to be bound thereby, all of which will be deemed to be part of this Agreement for the purposes of this Section 15, and not wishing to create misunderstandings, confusion and possible conflict through reference to any alleged prior and/or contemporaneous oral and/or written representations, understandings, agreements or otherwise, or any legal doctrines such as "good faith and fair dealing" or otherwise which might introduce an element of uncertainty into our relationship, jointly intend, represent, warrant and agree that:

(1) this Agreement contains the final, complete and exclusive expression of the terms of your and our agreement, and the final, complete and exclusive expression of your and our intent, and entirely supersedes and replaces any and all prior and/or concurrent understandings, agreements, inducements, prior course(s) of dealing, representations (financial or otherwise), promises, options, rights-of-first-refusal, guarantees, warranties (express or implied) or otherwise (whether oral or written) between you and us,

(2) there are no prior and/or concurrent understandings, agreements, inducements, course(s) of dealing, representations (financial or otherwise), promises, options, rights-of-first-refusal, guarantees, warranties (express or implied) or otherwise (whether oral or written) which are not fully expressed in this Agreement, and

(3) no prior and/or concurrent understandings, agreements, inducements, course(s) of dealing, representations (financial or otherwise), promises, options, rights-of-first-refusal, guarantees, warranties (express or implied) or otherwise (whether oral or written) of any kind or nature whatsoever have been made by us or anyone else, nor have been relied on by you nor will have any force or effect; excepting only the written representations made by you in connection with your application for this franchise.

You and we each expressly disclaim any understandings, agreements, inducements, course(s) of

dealing, representations (financial or otherwise), promises, options, rights-of-first-refusal, guarantees, warranties (express or implied) or otherwise (whether oral or written) which are not fully expressed in writing in this Agreement. This is equally important to you, as well as us, since, just as we do not wish to deal with allegations that we may have made or entered into understandings, representations, etc. not fully expressed in writing in this Agreement (such as alleged earnings claims), you do not wish to deal with allegations that you made or entered into understandings, representations, etc. (such as promises to achieve particular sales or Royalty Fee payment levels, would open a particular number of units, etc.) which are not fully expressed in writing in this Agreement.

In particular, we have not authorized, and you have not been promised, nor have we or anyone else made, nor have you received or relied on, any promises, representations or warranties that:

(1) any payments by you are refundable at your option,

(2) we will repurchase any rights granted hereunder (or any associated business) or will be able to assist you in any resale,

(3) you will succeed in the franchised business,

(4) you will achieve any particular sales, income or other levels of performance,

(5) you will have any exclusive rights of any type other than as expressly set forth herein,

(6) you will receive any level of advertising (television or otherwise), marketing assistance, site location, development or other services, operational assistance or otherwise other than as expressly set forth in this Agreement,

(7) you will not be required to obtain any licenses in order to operate your Slender Lady Center business,

(8) any location will be successful,

(9) it will be anyone's responsibility other than yours to obtain all licenses necessary in order to establish and operate your Slender Lady business, or

(10) that you will be awarded additional or further franchises or other rights, except as expressly set forth in a written document signed by a corporate officer of Slender Lady, Inc.

No contingency, condition, prerequisite, prior requirement, or otherwise (including but not limited to obtaining financing, obtaining a site or otherwise) exists with respect to you fully performing any or all of your obligations under this Agreement.

You have not received or relied on (nor have we or anyone else provided) any oral or written: sales, income or other historical results, projections or otherwise, of any kind or nature or any statements, representations, data, charts, tables, spreadsheets or mathematical calculations or otherwise which stated or suggested any level or range of actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise and neither we nor anyone else has made, nor have you relied on, any promises, representations or warranties as to any profits or otherwise you may realize in the operation of a Slender Lady Center, nor have you received or relied on any representations regarding any working capital or other funds necessary to reach any "breakeven" or any other financial level. We can't reliably predict, forecast or project future performance, revenues, profits or otherwise of any Slender Lady Center, even including one owned and/or operated by us, due to the large number of factors outside our control, and we **certainly** can't reliably predict what your results might be. You understand that results will vary from unit to unit. If any such information, promises, representations

and/or warranties has been provided to you, they haven't been authorized, they should not be relied on, we will not be bound by them, and, if you do rely on such information, promises, representations and/or warranties, you do so at your own risk.

You acknowledge and agree that the success of the business venture contemplated to be undertaken by you is speculative, is and will be dependent on your personal efforts, that while we can provide you with systems, methods, procedures, techniques and other "tools," including the Slender Lady® System and otherwise, your success ultimately depends on your efforts, including your proactive, diligent and thorough knowledge and application of the Slender Lady® System, that entry into any business enterprise is always associated with risk and that no assurance of success has been or can be given to you. You acknowledge and represent that you have entered into this Agreement and made an investment only after (1) making an independent investigation of the opportunity, including having received a list, in connection with the presentation of our Uniform Franchise Offering Circular, of (and having spoken with) other franchisees currently operating or who have operated Slender Lady Centers, (2) having had an opportunity to have this transaction and all related documents reviewed by an attorney and a financial advisor of your choosing, such review having been strongly recommended by us and (3) having independently researched all applicable licensing and other requirements related to the operation of your Slender Lady Center. You acknowledge that you and each person signing as Franchisee (and/or having any investment and/or interest in your Slender Lady Store) has received, reviewed, understood and fully read, and all questions have been answered regarding, (1) a copy of our Uniform Franchise Offering Circular with all exhibits at least ten (10) business days prior to the earlier of your and/or any such person (a) signing any binding documents or (b) paying any sums and (2) a copy of this Agreement and all other agreements complete and in form ready to sign at least five (5) business days prior to the earlier of your and/or any such person's (a) signing any binding documents or (b) paying any sums.

You understand, acknowledge and agree that (1) we may have offered franchises in the past, may currently be offering franchises and/or may offer franchises in the future on economic and/or other terms, conditions and provisions which may significantly differ from those offered by this Agreement and any related documents, and (2) there may be instances where we have varied, or will vary, the terms on which we offer franchises, the charges we (and/or our affiliates) make or the manner in which we otherwise deal with our Franchisees to suit the circumstances of a particular transaction, the particular circumstances of that Franchisee or otherwise, in each case in our sole and absolute discretion.

You understand that we are relying on you to bring forward in writing at this time any matters inconsistent with any of the matters set forth in this Section 15 or otherwise so that we can correct any misunderstandings or inappropriate expectations and you agree that if any of the statements or matters set forth in this Section 15 or otherwise are not true, correct and complete you will make a written statement regarding such next to your signature below so that we may address and resolve any such issue(s) at this time and before either you or we go forward.

You acknowledge and agree that in all of your dealings with the Franchisor, the officers, directors, employees, and agents of the Franchisor act only in a representative capacity and not in an individual capacity. You further acknowledge that this Agreement, and all business dealings between you and such Individuals as a result of this Agreement, are solely between you and Slender Lady, Inc. and that no other persons and/or entities, including any of the Franchisor-Related Persons/Entities, have or will have any duties or obligations to you. You further represent to us, as an Inducement to our entry into this Agreement, that you have made no misrepresentations in obtaining the Franchise.

16.    **TRANSFERABILITY OF INTEREST**

16.1    **Transfers by Us.** This Agreement, and any and/or all of our rights and/or obligations under it, are fully transferable by us in our sole and absolute discretion and will inure to the benefit of any person or entity to whom we transfer it, or to any other legal successor to our interest in this Agreement. If we transfer this Agreement or any and/or all of our rights and/or obligations under it, all past, current and future obligations of ours (and of any of the Franchisor-Related Persons/Entities) to you will cease

and be forever extinguished. We may be sold and/or we may sell any or all of our intellectual property and/or other assets (including the Marks) to a competitive or other entity, we may go public, may engage in a private or other placement of some or all of our securities, may merge, acquire other entities and/or assets (competitive or not), be acquired by a competitive or other entity, and/or may undertake any refinancing, leveraged buy-out and/or other transaction. You waive any and all claims, demands and/or damages with respect to any transaction or otherwise allowed under this section or otherwise. In view of the efficiencies, economies and other advantages which may be obtained through local servicing of Franchisees' needs, we may, on a permanent, temporary or other basis, delegate any or all of our duties to another company (the "Area Representative") and, in such event, you will look only to such Area Representative for the performance of such duties and not make any claims against us and/or any of the Franchisor-Related Persons/Entities in connection with any alleged acts or omissions of ours and/or such Area Representative. The benefits and protections of this Agreement, which apply to us and/or any of the Franchisor-Related Persons/Entities shall also apply to any past, current and/or future Area Representative.

**16.2    Transfers by You.**  The rights and duties created by this Agreement are personal to you (or your owners if the Franchisee is a partnership or corporation) and we have awarded the Franchise to you relying on the individual or collective character, skill, aptitude, attitude, business ability and financial capacity of you or such owners. Accordingly, neither this Agreement nor the Franchise (nor any interest therein), nor any part or all of the ownership of the Franchisee or your Slender Lady Center (or any interest in it or assets associated with any of the foregoing), may be transferred without our prior written approval. Any such transfer (or attempted transfer) without such approval will constitute a breach hereof and convey no rights to, or interests in, this Agreement, the Franchise, the Franchisee, your Slender Lady Center, such assets or otherwise. You or the transferee must pay us a non-refundable transfer fee of Two Thousand Five Hundred Dollars ($2,500.00), which includes  training costs for one transferee, subject to inflation adjustment as set forth in this Agreement, provided that we may reduce, defer or waive such fee in individual cases in our sole and absolute discretion. Such fee must be deposited with us on a non-refundable basis on your notification to us of the proposed transfer and prior to our undertaking any review, drafting of documents or other activities. You and each of your owners and/or affiliates [and the transferee (and each owner and/or affiliate of the transferee) if the transferee or such owner and/or affiliate is or has been a franchisee of, or had any other relationship with, us or any of the Franchisor-Related Persons/Entities] must execute a general release, in a form prescribed by us, of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, <u>known or unknown</u>, against us and/or any of the Franchisor-Related Persons/Entities.

The term "transfer" includes (<u>but is not limited to</u>); any voluntary, involuntary, direct or indirect assignment, sale, gift, pledge, mortgage of or any granting of any security or other interest (whether or not controlling) in; (1) this Agreement; (2) the Franchise; (3) the ownership of the Franchisee; (4) your Slender Lady Center; or (5) any assets associated with any of the foregoing and which is not in the ordinary course of business. A transfer also includes (<u>but is not limited to</u>) the following events: (1) any transfer of ownership of capital stock  or  any partnership or similar interest; (2) any merger or consolidation or issuance of additional securities representing an ownership interest in the Franchisee; (3) any sale of voting stock of the Franchisee or any security convertible to voting stock of the Franchisee; (4) any transfer in a divorce, insolvency, corporate or partnership dissolution proceeding or otherwise by operation of law; (5) any transfer of any interest in any revenues, profits, rights or assets of your Slender Lady Center; (6) any transfer to a business entity and/or a trust or similar entity controlled by you (in which case the transfer fee will be waived);  or (7) the creation or otherwise of any security or similar interest affecting any of the foregoing.  Any transfer by the Franchisee (or any of your owners) to a corporation and/or of any interest in the event of your death or the death of an owner of the Franchisee, by will, declaration of or transfer in or to a trust, under the laws of intestate succession or otherwise will be governed by all of the provisions on transfer of this Agreement.  We may, in our sole and absolute discretion, deny approval to any transfer involving a portion of your Franchise (for example, but not limited to, a portion of any territory) or a portion of any of the foregoing items.

~~16.3    Death or Disability of Franchisee.  On your death or permanent disability or, if the~~ Franchisee is a corporation or partnership on the death or permanent disability of the owner of a controlling interest in the Franchisee, the executor, administrator, conservator, guardian or other

personal representative of such person will transfer his or her interest in this Agreement and the Franchise, or such interest in the Franchisee, to a third party subject to our consent and all of the provisions of this Agreement with respect to a transfer and possible exercise of our right-of-first-refusal. Such disposition of this Agreement and the Franchise, or such interest in the Franchisee (including, without limitation, transfer by bequest or inheritance), will be completed within a reasonable time, not to exceed six (6) months from the date of death or permanent disability and will be subject to all the terms and conditions applicable to transfers contained in this Agreement. Failure to so transfer the interest in this Agreement and the Franchise, or such interest in the Franchisee, within said period of time will constitute a breach of this Agreement. You shall be deemed to have a "permanent disability" if your personal, active participation in management of your Slender Lady Center is for any reason curtailed for a continuous period of six (6) months.



In the event of your death, disability, absence or otherwise, we can (but are not required to) operate the franchised business on your behalf and at your expense for such period of time (and under such terms and conditions) as we determine, including paying out of the assets and/or revenues of the franchised business any or all past, current and/or future obligations of the franchised business (including any amounts owed to us and/or any affiliate) in such priorities as we determine from time to time in our sole and absolute discretion. We can pay ourselves a reasonable amount to reimburse us for our management services and other costs. We can obtain approval of a court or arbitrator for any such arrangements, the attorney's fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the franchised business. You (and/or your estate) will indemnify us against any costs and/or liabilities incurred by us in connection with, or related in any way to the operation (or otherwise) of the franchised business.



**16.4    Effect of Consent to Transfer.** Our consent to a transfer, or failure to exercise any right-of-first-refusal, will not constitute a waiver of any claims we may have against you (or your owners), nor will it be deemed a waiver of our right to demand exact compliance with any of the terms or conditions of this Agreement or any other agreement by any transferor or transferee. Unless we expressly release you from your obligations under this Agreement (which we have no obligation to do), you will remain and be liable for each of the payment and other obligations under this Agreement (and any other agreement with us and/or any affiliate) and any Franchise Agreement and/or other agreement executed by any transferee, including any defaults by any transferee. Any transfer (including any transfer consented to by us and even if the transferee executes a new franchise agreement) will not act as a termination of your confidentiality, indemnity, non-competition or other obligations under this Agreement, including any obligations which by their nature survive the term of this Agreement [your non-competition obligations to expressly continue for the full original term of this Agreement plus any additional period(s) specified in Section 7.1 or otherwise], or affect your and our obligations and rights under the dispute avoidance and resolution provisions of this Agreement, including all of Articles 15 and 20. Any dispute regarding any proposed or completed transfer (including our failure to consent to a proposed transfer) will be resolved under the mediation/arbitration provisions of this Agreement and your sole remedy will be an order that we grant consent.

**16.5    Our Right-of-First-Refusal.** If you or any of the Franchisee's owners wish to engage in any transfer subject to this Agreement, (a) you or your owners will obtain a bona fide, executed written offer and earnest money deposit [in the amount of ten percent (10%) or more of the offering price and in the form of a cashier's check] and (b) a true and complete copy of the offer (and any proposed ancillary agreements) will immediately be submitted to us by you, the Franchisee's owners or both, together with a nonrefundable deposit of the transfer fee. The offer must apply only to an interest in this Agreement, the Franchise, your Slender Lady Center or the Franchisee and must not include the purchase of any other property or rights of yours (or the Franchisee's owners); but if the offeror proposes to buy any other property or rights from you (or the Franchisee's owners) under a related offer, the price and terms of purchase offered to you (or the Franchisee's owners) for the interest in this Agreement, the Franchise, your Slender Lady Center or the Franchisee will reflect the bona fide price offered therefor and will not

reflect any value for any other property or rights. We may exclude from the assets purchased hereunder any items that are not approved as meeting quality standards for Slender Lady Centers, as well as any portion of the price attributable to goodwill. If any of the assets to be purchased do not meet the standards we then apply to new Slender Lady Centers or you are in default, we can require that such assets be replaced and/or brought into compliance with our requirements before the sale is completed, and/or such defaults be cured, and the time for us to give notice of intent to exercise our right-of-first-refusal will not begin to run until all such assets have been brought up to such standard and such defaults cured.

We'll have the right, exercisable by written notice delivered to you or the Franchisee's owners within thirty (30) days from the date of delivery of an exact copy of such offer to us, together with your deposit of any transfer fee and satisfaction of all other requirements for our consent to such transfer, to notify you that we have elected to purchase such interest for the price and on the terms and conditions contained in such offer (less any portion of the price attributable to goodwill), provided that we may substitute cash, a cash equivalent, or securities of equal value for any form of payment proposed in such offer, our credit will be deemed equal to the credit of any proposed purchaser, and we will have not less than sixty (60) days from the date you receive our notice of intention to exercise such right-of-first-refusal to prepare for closing. We'll be entitled to purchase any interest subject to all customary representations, warranties and agreements given by the seller of the assets of a business or voting stock of an incorporated business, as applicable including, without limitation, representations and warranties as to ownership, condition and title to stock and/or assets, liens and encumbrances relating to the stock and/or assets, validity of contracts and liabilities, contingent or otherwise, of the corporation whose stock is purchased and including typical non-competition covenants by the seller and each owner of the Franchisee. In connection with such purchase, you will sign a general release, in form prescribed by us, of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, known or unknown, against us and/or any or all of the Franchisor-Related Persons/Entities. If, for any reason, such transaction is not consummated within one hundred and twenty (120) days after the date of delivery of an exact copy of such offer to us, together with your deposit of any transfer fee and satisfaction of all other requirements for our consent to such transfer, or if you seek to effect a transaction on terms and conditions or to any person or entity, other than as set forth in the offer disclosed to us by you, then the proposed transaction shall be deemed withdrawn, and all of the provisions of this section shall again become fully applicable, as if such transaction had not been proposed.

If we do not exercise our right-of-first-refusal, you or your owner may complete the sale to such purchaser pursuant to and on the exact terms of such offer, subject to the conditions provided in this Agreement, provided that if there is a material change in the terms of the sale, we will have an additional right-of-first-refusal for thirty (30) days on the same terms and conditions as are applicable to the initial right-of-first-refusal. Our rights under this or any other Section may be assigned by us, in our sole and absolute discretion, to any person or entity we choose.

**16.6    Our Right to Purchase Any or All of the Assets of Your Traditional Slender Lady Center on Expiration or Termination, During First 18 Months, etc. at Fair Market Value.** At any of the following points in time: (a) on, and/or within 120 days after termination by us of our obligations and/or your rights under this Agreement, (b) on, and/or within 120 days after any other termination (including rescission) of this Agreement, (c) on, and/or within 120 days after expiration of this Agreement, (d) on, and/or within 120 days after any repurchase by us of your rights under this Agreement, (e) on, and/or within 30 days after the date of delivery to us of a true and complete copy of any offer which is subject to the right-of-first-refusal provisions of this Agreement (together with the deposit and satisfaction of all other requirements for our consent to such transfer)] and/or (f) from the date of this Agreement through eighteen (18) months after the date of the opening of your traditional Slender Lady Center (but extended, in any event, by any period during which you and/or any affiliate of yours is or has been in

~~default, even if cured, of any obligation to us and/or any of the Franchisor/Related Persons/Entities)~~, we will have the option (but no obligation), exercisable by giving written notice thereof, to purchase from you any or all of the assets used in, or in connection with, your traditional Slender Lady Center, including (but not limited to) the Designated Equipment.

Assets available for purchase by us will include, without limitation, real property, leasehold interests (subject to our obtaining title without purchase as a result of lease assignment or otherwise) and/or improvements, equipment, furniture, fixtures, signs, inventory and/or the lease or sublease for your Slender Lady Center. If the premises were not leased to you by us or our affiliate, the right to an assignment of your lease or sublease for your Slender Lady Center (or, if assignment is prohibited, a sublease for the full remaining term and on the same terms and conditions as your lease) will be included as part of the purchase. We'll have the unrestricted right to assign any option to purchase and/or any related rights. We'll be entitled to all customary representations, warranties and agreements given by the seller of the assets of a business, including, without limitation, representations and warranties as to ownership, condition and title to assets, liens and encumbrances relating to assets, validity of contracts, and liabilities (contingent or otherwise) and including typical non-competition covenants by the seller and each owner/executive of the Franchisee. The purchase price will be fair market value, determined in a manner consistent with reasonable depreciation of leasehold improvements owned by you and the items purchased, provided that, in any event, the purchase price will not contain any factor or increment for the Marks, ~~any goodwill, going concern value (in the case of termination and/or expiration), and further provided that we may exclude from the assets purchased any equipment, furniture, fixtures, signs, inventory or otherwise that do not meet quality and/or system standards for Slender Lady Centers. There shall be no provision for payment of leasehold improvements, the title to which shall be governed by the terms of your lease or sublease for your Slender Lady Center premises~~. The length of the remaining term of the lease or sublease for your Slender Lady Center will not be considered in determining fair market value of any lease or sublease to be acquired. If you and we are unable to agree on the fair market value of any assets, fair market value will be determined by an independent appraiser selected by you and us, and if you and we are unable to agree on an appraiser, you and we will each select one appraiser, who together will select a third appraiser, and the fair market value will be deemed to be the average of the three (3) independent appraisals. All sales, transfer and/or similar taxes are to be paid by you. In connection with such purchase, you (and each affiliate of yours) will execute a General Release.

We may include in the purchase the cancellation of your franchise rights and, if we do so, the compensation for your franchise rights will be calculated as follows: (a) If you are operating under the initial term at the time we elect such option, the compensation will equal the initial franchise fee paid by you times a fraction, the numerator of which shall be the number of full months remaining in your initial term and the denominator of which shall be the number of full months originally covered by initial term; (b) If you are operating under a successor franchise term at the time we elect such option, the compensation will equal the successor franchise fee paid by you times a fraction, the numerator of which shall be the number of full months remaining in your successor franchise term and the denominator of which shall be the number of full months originally covered by your successor franchise term. In no case will any amount be paid with respect to any possible successor franchise term which you are not then operating under, whether or not you have elected to exercise any successor franchise rights.

~~The purchase price may be paid by us or our assignee in cash, securities or pursuant to an unsecured promissory note as follows: Twenty Percent (20%) of the purchase price will be paid on closing, the second Twenty Percent (20%) will be paid no later than ninety (90) days after closing, the third Twenty Percent (20%) no later than one hundred eighty (180) days after closing, the fourth Twenty Percent (20%) no later than two hundred ten (210) days after closing, and the final Twenty Percent (20%) no later than two hundred fifty (250) days after closing (in all cases without interest), provided that if we~~

EXHIBIT B
(PART 3 OF 3)

~~require non-competition covenants to be given, the final Forty Percent (40%) of the purchase price may~~ ~~be paid out in 60 equal monthly installments, beginning at 60 days after close with no interest.~~ Closing will take place no later than thirty (30) days after receipt by you of notice of exercise of this option to purchase, at which time you will deliver instruments transferring to us or our assignee: (1) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us in our sole and absolute discretion), and demonstrating that all sales, transfer and/or similar taxes are to be paid by you through escrow if we so require; (2) all licenses and permits of your Slender Lady Center which may be assigned or transferred; and (3) the lease or sublease for your Slender Lady Center, if acquired by us. If you cannot deliver clear title to all of the purchased assets as aforesaid, or in the event there are other unresolved issues, or we otherwise require in our sole and absolute discretion, the closing of the sale will be accomplished through an escrow. You and we will, prior to closing, comply with any applicable bulk sales and/or similar laws. We'll have the right to set off against and reduce the purchase price by any and all amounts owed by you (or any affiliate) to us or any affiliate of ours, and the amount of any encumbrances or liens against the assets or any obligations assumed by us. If we exercise this option to purchase, pending the closing of such purchase as hereinabove provided, we will have the right to appoint a manager to maintain the operation of your Slender Lady Center. Alternatively, we may require you to close your Slender Lady Center during such period without removing any assets from your Slender Lady Center. You'll maintain in force all insurance policies required pursuant to this Agreement, until the date of closing. Our rights under this or any other Section may be assigned by us, in our sole and absolute discretion, to any person or entity we choose.

If such option is exercised, you will forever indemnify and hold us harmless against, all obligations incurred in connection with the business. You'll furnish us with a complete list of accounts unpaid by you within ten (10) days of our notice of intent to exercise this option. We may (but are not required to) pay these unpaid bills directly to the parties owed and deduct them from the purchase price in lieu of paying such portion of the purchase price directly to you.

## 17. GRANT OF SECURITY INTEREST.

For valuable consideration, as security for the payment of all amounts owing or to be owed by you (and/or any affiliate of yours) to us (and/or any affiliate of ours) from time to time under this Agreement, any other agreements or otherwise, and the performance of all the obligations to be performed by you, you hereby grant to us a security interest in all of the assets, including equipment, furniture, fixtures and signs, used by, at or in connection with your Slender Lady Center and its related business and all proceeds of your Slender Lady Center (the "Collateral"). You represent and warrant that the security interest granted is prior to all other security interests in the Collateral except for (a) bona fide purchase money security interests and (b) the security interest granted to a third party in connection with your original financing for your Slender Lady Center, if any. You'll not remove the Collateral or any portion thereof without our prior written consent. On the occurrence of any event entitling us to terminate your rights and/or our obligations under this Agreement or any other agreement between the parties, or if we otherwise reasonably determine that we are not assured that all of your (and/or any affiliates') obligations will be timely and fully paid and/or performed, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the State in which your Slender Lady Center is located, including, without limitation, the right to take possession of the Collateral. You'll execute and deliver to us financing statements and/or such other documents as we reasonably deem necessary to perfect our interest in the Collateral within ten (10) days of receipt by you of such documents from us.

## 18. NOTICES.

**18.1** Any notices required or permitted to be given under this Agreement shall be given by United States Mail, certified or registered, return receipt requested, postage prepaid, directed to Franchisor or Franchisee at their addresses shown herein or at such other address as they may subsequently designate in writing.

**18.2** Notice by mail shall be deemed given upon the depositing thereof in a United States Postal Service facility as shown on the receipt therefor.

## 19. RELATIONSHIP OF THE PARTIES; INDEMNIFICATION.

**19.1** **Independent Contractor.** You and we understand and agree that neither this Agreement nor anything else creates, or is intended to create, a fiduciary or agency relationship between you and us, (any such or similar relationships being expressly disavowed) that you and we are and will be independent businesses, and that nothing in this Agreement is intended to make either you or us a general or special agent, joint venturer, partner, employee or fiduciary of or for the other for any purpose. You'll conspicuously and clearly identify yourself (through prominently placed signage and otherwise as we direct) in all dealings with customers, suppliers, public officials, employees and others as an independent owner of your Slender Lady Center under a franchise awarded by us and make it clear that the operation of your Slender Lady Center is separate and distinct from the operation of our business. In particular, you'll place notices of independent ownership on such forms, business cards, stationery, advertising, signs and other materials, as we require from time to time. Subject to the requirements of this Agreement and the Manuals, you'll have complete operational control of your business, including the right to hire and fire each employee.

**19.2** **No Liability for Acts of Other Party.** You won't use any of the Marks or System in a manner that may result in our liability for any indebtedness or obligations of yours, nor use the Marks or System in any way not expressly authorized in this Agreement. Neither we nor you will make any express or implied agreements, warranties, guarantees or representations, or incur any debt in the name, or on behalf, of the other, or represent that your and our relationship is other than that of independent Franchisor and Franchisee. Neither you nor we will be obligated by or have any liability under any acts, omissions, agreements or representations made by the other that are not expressly authorized in writing. ~~nor will~~ we be obligated for any damages to any person or property directly or indirectly arising out of the operation of ~~your Slender Lady Center or otherwise,~~ all such obligations and liabilities being solely yours *AND OURS* and you indemnifying us and each of our affiliates with respect thereto. *OUR RESPECTIVE BUSINESSES.* *RESPECTIVELY*

**19.3** **Taxes.** We'll have no liability for any sales, VAT, GST, use, service, occupation, excise, gross receipts, income, property or other taxes, whether levied on you, your Slender Lady Center or your property, or on us, in connection with the sales made and/or business conducted by you (except for any taxes we are required by law to collect from you with respect to purchases from us). Payment of all taxes will be your sole responsibility.

**19.4** **Responsibility, Indemnity, etc.** You're the only one responsible for any damage, loss or other claims arising out of, or related in any way to, any of your acts, errors or omissions, whether related to you, your employees, agents or representatives, your operations or ownership of your Slender Lady or otherwise arising. You will indemnify and hold harmless us, all of the Franchisor-Related Persons/Entities, all Slender Lady Franchisees or other operators and/or any of the foregoing, from all fines, suits, proceedings, claims, demands, actions, losses, damages, costs, fees (including attorney's fees and related expenses) and/or any other expense, obligation and/or liability of any kind or nature (including, but not limited to, claims of negligence), however arising, growing out of or otherwise connected with and/or related to any act, error and/or omission of yours (including, but not limited to, your ownership and/or operation of your Slender Lady Center, any act or omission of your employees and/or agents, and/or any transfer of any interest in this Agreement, your Slender Lady Center, the Franchise, the Franchisee or otherwise). We'll have the right to control all litigation, and defend and/or

settle any claim against and/or including your Franchise and/or including us and/or the Franchisor-Related Persons/Entities or affecting our and/or their interests, in such manner as we deem appropriate in our sole and absolute discretion, in each case without affecting our rights under such indemnity.

With respect to anything (goods, services or otherwise) provided, approved or otherwise by us, the Franchisor-Related Persons/Entities and/or any person/company affiliated in any way with and/or referred/"approved" by us or them, other than specific written warranties expressly provided by us in connection with such items, such items are provided without any warranties, express or implied, the warranties of merchantability and fitness for a particular purpose being expressly disclaimed, nor do there exist any express or implied warranties on the part of us, the Franchisor-Related Persons/Entities or any affiliate as to the design, condition, capacity, performance or any other aspect of such items or their material or workmanship. Any warranty or other responsibility with respect to any Designated Equipment, Products and/or Services or otherwise will be those of the manufacturers or service providers only.

Neither we nor any of the Franchisor-Related Persons/Entities, any supplier designated by us or otherwise will have any liability and/or obligation with respect to, [and neither you, nor any affiliate of yours, will make (and you and each affiliate of yours will forever hold us and each of the Franchisor-Related Persons/Entities harmless with regard to) any claims against us, any of the Franchisor-Related Persons/Entities, any supplier designated by us or otherwise, with respect to] any failures, errors or otherwise, of or by (and/or any loss, damage, liability, expense or otherwise caused by or related to) any computer systems, software, hardware or otherwise, whether or not provided and/or specified by us, any of the Franchisor-Related Persons/Entities and/or any supplier, including (but not limited to) any losses of any nature resulting from defects, incompatibilities or malfunctions of computer hardware or software and/or any other computer-related problems.

**19.5    Disclosure.**  We may, in our sole and absolute discretion, disclose, whether in offering circulars or otherwise, any information relating to your ownership and operation of your Slender Lady Center, including (but not limited to) your name, any address and/or phone number, revenues, expenses, results of operations or other information.

## 20.    DISPUTE AVOIDANCE AND RESOLUTION.

**20.1    Mediation and Mandatory Binding Arbitration, Waiver Of Right To Trial By Jury, etc.** Realizing that in business relationships there's always a possibility of differences of opinion or other disagreements and that what is most important is to resolve any disputes amicably, quickly, inexpensively and professionally and to return to business as soon as possible, it's with that same spirit of cooperation that you and we pledge to resolve differences and to use the procedures specified in this Agreement (and particularly this Article 20), believing that these procedures will reduce instances of possible disputes and make the resolution of any disputes which do arise less expensive, quicker, less subject to public notoriety and achievable in a less formal and antagonistic means than litigation, as well as to increase the opportunities for you and us to maintain a mutually beneficial business relationship. Therefore, you and we agree as follows:

(a)    Any litigation, claim, dispute, suit, action, controversy, proceeding or otherwise ("claim") between or involving you (and/or any owner and/or affiliate of yours or which could be brought by, or on behalf of, you, any owner and/or affiliate of yours) and us (and/or any claim against or involving any or all of the Franchisor-Related Persons/Entities or otherwise), except as expressly provided below at Section 20.1 (e), whether arising out of or relating in any way to this and/or any other agreement and/or any other document, any alleged breach of any duty or otherwise (including but not limited to the underlying legality of the offer and/or sale of any franchise, any action for rescission or other setting aside of such sale or any transaction, agreement or document and any claim that this Agreement or any

portion thereof is invalid, illegal, void, unenforceable or otherwise and any claim of fraud, including fraud in the inducement) and on whatever theory and/or facts based, will be:

(1)     First, discussed in a face-to-face meeting between you (or an individual authorized to make binding commitments on behalf of the Franchisee) and a corporate executive of ours authorized to make binding commitments on our behalf. This meeting will be held at our then-current headquarters and within 30 days after either you or we give written notice to the other proposing such a meeting.

(2)     Second, if, in the opinion of either you or us, the meeting has not successfully resolved such matters and if desired by any person or entity involved in the claim, submitted to non-binding mediation for a minimum of eight hours before (a) Franchise Arbitration and Mediation, Inc. ("FAM") (or an organization designated by FAM) or (b) any other mediation organization approved by all such persons and/or entities or (c) by Judicial Arbitration and Mediation Service (JAMS) if FAM cannot conduct such mediation and the parties cannot agree on a mediation organization. On election by any party, arbitration and/or any other remedy allowed by this Agreement may proceed forward at the same time as mediation. In the mediation, you and we shall each be represented by an individual authorized to make binding commitments on each party's respective behalf and may be represented by counsel. In addition, you and/or we may, with permission of the mediator, bring such additional persons as are needed to respond to questions, contribute information and/or participate in the negotiations. The mediator shall be disqualified as a witness, consultant, expert or counsel for any party with respect to the dispute and any related matters.

(3)     Third, if neither you nor we desire mediation (or if such mediation is not successful in resolving such claim), submitted to and finally resolved by binding arbitration before and in accordance with the arbitration rules of FAM (or any successor organization); provided that if such arbitration is unable to be heard by FAM for any reason, the arbitration will be conducted by Judicial Arbitration and Mediation Service (JAMS.). In each case, the parties to any mediation/arbitration will execute appropriate confidentiality agreements, excepting only such public disclosures and filings as required by law.

(b)     Any mediation/arbitration (and any appeal of arbitration) will be exclusively conducted at our then-current headquarters (which may be at a different place than our present headquarters), to facilitate participation of important individuals and availability of documents, etc. to the resolution of the matter, and by a mediator/arbitrator experienced in franchising. You and we acknowledge the critical importance of a single source for decisions in arbitration (and in any court actions) to guide you and us, to reduce the possibility of inconsistent decisions and awards which could adversely affect the uniform development and administration of the Slender Lady System and group of companies and to maximize the opportunity for the arbitrator to give due consideration to your and our ongoing practical business needs in this regard. Except as expressly provided below, the parties to any mediation or arbitration will bear their own costs, including attorney's fees. Any claim, and any mediation/arbitration, will be conducted and resolved on an individual basis only and not on a class-wide, multiple plaintiff or similar basis. On request of any party to a claim, the arbitrator may be required to issue a written award, specifying the facts found and the law applied, but the party so requesting will bear the fees and charges incurred in connection therewith. The arbitrator (and any arbitration appeal panel) shall follow and apply all applicable law and a failure to do so shall be deemed an act in excess of authority. The arbitrator may award or otherwise provide for temporary restraining orders, preliminary injunctions, injunctions, attachments, claim and delivery proceedings, temporary protective orders, receiverships and other pre-judgment, equitable and/or interim relief as appropriate pending final resolution by binding arbitration of a claim, as well as in connection with any such final resolution, and may issue summary orders disposing of all or part of a claim at any point. Each party consents to the enforcement of such orders, injunctions, etc. by any court having jurisdiction. In any arbitration, any and all pre-trial discovery devices (including, but not limited to, depositions, written interrogatories, requests for admission, and requests for

production, inspection and copying of documents) will be available to the disputants as if the subject matter of the arbitration were pending in a civil action before a court of general jurisdiction in the state whose law is to be applied under Section 20.14; provided however that in no event may offers and/or other communications made in connection with, or related in any way to, possible settlement or other resolution of a dispute be admitted into evidence or otherwise used in connection with any arbitration or other proceeding, and any arbitration award in violation of this provision shall be vacated by the arbitration appeal panel (described below) and/or any court having jurisdiction. The subpoena powers of the arbitrator with respect to witnesses to appear at the arbitration proceeding shall not be subject to any geographical limitation.  The disputants shall have the same discovery rights as are available in civil actions in the state whose law is chosen under Section 20.14  The arbitrator (rather than a court) shall decide any questions relating in any way to the parties' agreement (or claimed agreement) to arbitrate, including but not limited to applicability, subject matter, timeliness, scope, remedies, claimed unconscionability and any alleged fraud in the inducement or otherwise. Each participant must submit or file any claim constituting a compulsory counterclaim (as defined by the applicable rule under the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates.  Any such claim that is not submitted or filed in such proceeding will be forever barred.  Any offers, discussions, negotiations, mediations or otherwise in connection with possible settlement or other resolution of any claim may not be introduced in evidence (or for any other purpose) in any arbitration proceeding, court proceeding or otherwise.

The parties to the dispute shall share the fees and expenses of the mediator(s), arbitrator(s), mediation organization and/or arbitration organization equally.

In any mediation, arbitration and/or any court proceeding, where a party seeks monetary relief and/or compensation, or rescission, the first party who seeks such relief shall, on initiating such a mediation, arbitration or court proceeding [or (if later) on requesting such relief] deposit $10,000 (subject to adjustment for inflation) with such organization (and/or with the court) to cover the costs and fees charged (or to be charged) by such mediation and/or arbitration organization and/or any costs recoverable in a court proceeding, but, in any case, not including any attorney's fees.  If such party does not receive substantially all of its initial demand(s) in mediation, or does not prevail in such arbitration or court proceeding, such party shall bear all fees and costs charged by the mediating and/or arbitrating organization, and/or any costs recoverable in a court proceeding but, in any case, not including any attorney's fees.  In the event that any provision of this Section 20.1 (or any other portion of this Agreement) is invalid or unenforceable, such provision will be construed as independent of, and severable from, every other provision and such provision will be modified or interpreted to the minimum extent necessary to have it comply with the law (including making such provision mutual in effect) and the remaining provisions will remain in full force and effect.

(c)     If any party to an arbitration wishes to appeal any final award by an arbitrator (there will be no appeal of interim awards or other interim relief), that party can appeal, within thirty (30) days of such final award, to a three (3) arbitrator panel to be appointed by the same organization as conducted the arbitration, such panel to conduct all proceedings at the same location as specified in subsection (b) above.  The issues on appeal will be limited to the proper application of the law to the facts found at the arbitration and will not include any trial *de novo* or other fact-finding function.  The party requesting such appeal must pay all costs and fees charged by such arbitration appeal panel and/or arbitration organization in connection with such appeal, as well as posting any bond deemed appropriate by such arbitration organization or arbitration appeal panel.  In addition, a party requesting appeal who does not prevail on appeal, will pay the other party's (or parties') attorneys' fees and other costs of responding to such appeal.

(d)     Judgment on any preliminary or final arbitration award (subject to the opportunity for appeal as contemplated above) may be entered in any court having jurisdiction and will be binding, final and non-appealable.

(e)    Disputes with respect to claims or issues relating primarily to (i) the validity of the Marks or other intellectual property of ours, or (ii) any disputant's rights to possession of any real and/or personal property (including any action in unlawful detainer, ejectment or otherwise) shall be subject to court proceedings only.

(f)    Notwithstanding any provisions of this Agreement or otherwise relating to which state or provincial laws this Agreement and/or construed under, any provisions of state, provincial or other law to the contrary and/or any statements in our Offering Circular required as a condition of registration or otherwise, you and we mutually intend and agree that (1) all issues relating to arbitrability and/or the enforcement of the agreement to arbitrate contained herein will be (i) all issues relating to arbitrability and/or the enforcement of the agreement to arbitrate contained herein will be decided by the arbitrator (including all claims that this Agreement in general, and/or the within agreement to arbitrate and/or any other agreement, was procured by fraud in the inducement or otherwise) and (ii)will be governed exclusively by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration and (2)  Notwithstanding any provisions of state law to the contrary, you and we mutually intend and agree (and have expressly had a meeting of the minds) intend to fully enforce all of the provisions of this franchise agreement and all other documents signed by you and us, including (but not limited to) all venue, choice-of-laws, and mediation/arbitration provisions and other dispute avoidance and resolution provisions (including (but not limited to) those relating to arbitration, waiver of jury trial, limitation of damages, venue, choice of laws, shortened periods in which to bring claims or otherwise), and to rely on federal preemption under the Federal Arbitration Act (9 U.S.C. § 1 et seq.).

(g)    You and we each knowingly waive all rights to trial by a court or jury, understanding that arbitration may be less formal than a court or jury trial, may use different rules of procedure and evidence and that appeal is generally less available, still strongly preferring, and having mutually selected (for the reasons set forth in this section and the following one), mediation and/or arbitration as provided in this Agreement to resolve any disputes, except as expressly provided in Section 20.1 (e), you and we having had an express meeting of the minds on each these matters as set forth in Articles 15, 20 and/or otherwise.  You and we intend to (and each of us expressly agrees that the other may) fully enforce each of the provisions of this Article 20 (as well as all other provisions of this Agreement), including (but not limited to) those relating to arbitration, waiver of jury trial, limitation of damages, venue, choice of laws, shortened periods in which to bring claims or otherwise, you and we having had an express meeting of the minds regarding each of such matters.  You and we mutually intend and agree (and have expressly had a meeting of the minds) that the provisions of this Agreement (including, but not limited to, Articles 15 and/or 20) will control over any provisions of this Agreement or otherwise relating to which state or provincial laws this Agreement will be governed by and construed under, any provisions of state, provincial or other law to the contrary and/or any statements in our Offering Circular or otherwise required as a condition of registration or otherwise.

(h)    We may require that you and we jointly participate in any non-binding dispute resolution procedures (in addition to, and/or in place of, any of the procedures outlined above) as designated by us in our sole and absolute discretion, such as Summary Jury Trial, Non-Binding Arbitration, Early Neutral Evaluation and/or otherwise, any such proceeding(s) to be held at our then-current headquarters and the fees and expenses of the dispute resolution provider(s) and/or organization(s) to be shared equally by the parties to the dispute.                          — DURING ARBITRATION

(i)    Nothing in this Agreement shall be construed as limiting your right to seek recourse (but only in the manner set forth in this Section 20.1) for a termination by us, of your rights under this Agreement, that you contend is wrongful; provided, however, that your sole remedy will be to be reinstated as a Franchisee with no award of damages or other relief; provided further that, should it be determined by an Arbitrator or other final determiner of fact that any such termination by us was proper, you agree to, thereupon, grant us a release of any and all claims, liabilities and or obligations, of any nature, however arising, known or unknown, against us and/or any or all of the Franchisor-Related Persons/Entities.

(j)       You understand, agree and anticipate, at the time of being awarded this franchise, that mediation-arbitration-litigation will be  (subject only to express provisions otherwise in this Agreement) exclusively at a location at or near our headquarters (which location may change at any time as a result of our possibly moving our headquarters in the future and which may be a substantial distance from your location), waiving any provisions of state law or otherwise to the contrary) and that such provisions in this Agreement (along with other provisions of Articles 15 and 20, such as waiver of jury trial, limitations on damages, prohibitions on class actions, shortened statutes of limitations, etc.) may make it substantially more expensive and/or difficult for you to make claims against, or to defend against claims by, us and/or the Franchisor-Related Persons Entities. You anticipate that we will (and agree that we may) enforce all such provisions strictly according to their terms and agree that such provisions, when viewed in the context of a diverse franchise system with both large and small, sophisticated and unsophisticated participants,  but with a common need for uniformity and predictability, are neither unconscionable, unfair nor oppressive, but are justified by your and our practical business necessities and represent a reasonable balancing of the interests of all participants in the Slender Lady System. You agree that the provisions of Articles 15 and 20 are vital to (among other things) achieve uniformity in a diverse system, minimizing the risks of inconsistent decisions by numerous arbitrators/courts and that you, as much as we, have an interest in such uniformity and predictability to protect your investment, as well as maintaining the integrity of the Slender Lady system. You also understand and agree that the Federal Arbitration Act applies to all provisions of this Agreement, that such Act will preempt any state or other law to the contrary and, as a result, the provisions of this Agreement will be strictly enforced according to their terms and you acknowledge that you have a full opportunity to review and discuss, and have your questions answered regarding, this section.

20.2    **Venue, Waiver Of Rights To Trial By Jury, Limitation On Damages, etc.** Without in any way limiting or otherwise affecting your and our obligations regarding mediation/binding arbitration, you and we agree that any litigation between you and us (and/or involving any owner and/or affiliate of yours, and/or which could be brought by you or on your behalf, involving any of the Franchisor-Related Persons/Entities), whether to enforce an arbitration award or involving any litigation, dispute, controversy, claim, proceeding or otherwise which is not subject to any agreement regarding mediation/arbitration (or in the event that a court having jurisdiction should hold that any agreement regarding mediation and/or arbitration is not enforceable) or otherwise, and bearing in mind your and our joint interest in having a single court determine issues in a consistent manner for application throughout the Slender Lady System and not having us or our Franchisees exposed to inconsistent decisions, will be held exclusively before a court in the most immediate judicial district encompassing our then-current headquarters and having subject matter jurisdiction or the United States District Court encompassing our then-current headquarters [where a basis for federal jurisdiction exists, all filings, proceedings and otherwise (other than proceedings to remove or transfer a matter to such court and/or to compel compliance with the provisions of this Article 20, including compelling a face-to-face meeting, mediation and/or arbitration) will be exclusively in such Federal court, in preference to State court], you and we consenting to the exclusive jurisdiction of such court(s) and **WAIVING ALL RIGHTS TO TRIAL BY JURY**; provided that any action to obtain possession of any real and/or personal property (including any action in unlawful detainer, ejectment or otherwise) may be brought in a state or Federal court having jurisdiction over the real and/or personal property at issue. Any claim and any litigation will be conducted and resolved on an individual basis only and not on a class-wide, multiple plaintiff or similar basis.

So as to achieve many of the advantages which would normally be associated with arbitration (such as lower expense, more rapid resolution of controversies, fewer protracted and complex proceedings, reduced instances of costly and time-consuming appeal, use of a more sophisticated and experienced trier of fact and law, etc.) and for your and our mutual benefit, you and we agree that in any arbitration, litigation or otherwise, you (and each owner and affiliate of yours) and we each knowingly waive all rights to trial by jury.

In any arbitration, litigation or otherwise, you and we each waive any right to recover, and any

rights to make claims for (whether by claim, counter claim, offset, way of defense or otherwise), punitive, exemplary, multiple, pain-and-suffering, mental distress, incidental, consequential, special, lost income and/or profits (except as expressly provided below) and/or similar damages under any theory whatsoever, you and we agreeing that such claims are inherently speculative and subject to abuse, often serving as obstacles to the reasonable resolution or settlement of a dispute and frequently operating to primarily benefit the attorneys involved in the claim; provided that, in any event, we may recover the then-current value of any Initial Franchise Fees, Royalty Fees, marketing contributions and/or other payments you are, or would be, obligated to make, or would normally make (in the absence of a breach or termination) to us or any affiliated company, whether under this Agreement or otherwise, it being your and our intention that we receive the full benefit of our bargain with you, as well as any past due payments owed to us and/or any affiliate. IN ANY EVENT, OUR MAXIMUM LIABILITY (COMBINED WITH THE MAXIMUM LIABILITY OF ANY OF THE FRANCHISOR-RELATED PERSONS/ENTITIES) SHALL BE (COLLECTIVELY) LIMITED TO THE RETURN TO YOU OF THE INITIAL FRANCHISE FEE ACTUALLY PAID BY YOU and your maximum liability will be limited to the present value of the Royalty Fees, Marketing Fund contributions and other amounts which normally would have been paid by you ~~if the franchise had continued in existence for its full term and any renewals,~~ together with any past due payments owed to us and/or any affiliate, ~~but, in any case, there shall be no limitation on your indemnity and/or similar obligations, whether with respect to trade accounts, other third party claims or otherwise.~~ You and we have agreed on this limitation in recognition of the facts that the calculation of any actual damages would be exceedingly difficult and subject to speculation and possible abuse and that the foregoing compromises benefit both of us equally. You agree that we will not be required to post a bond in order to obtain any injunctive or other equitable relief or otherwise and that your only remedy if an injunction or other equitable relief is entered against you will be to obtain dissolution of such injunction, etc.

The dispute avoidance and resolution provisions of this Agreement (including, but not limited to, this Article 20 and Article 15) shall apply to any claims, arbitration, litigation or otherwise between you and us, and/or by any owner and/or affiliate of yours, or which could be brought by you or on your behalf, whether against us and/or any or all of the Franchisor-Related Persons/Entities.

**20.3    Prior Notice of Claims by You.** Since you and we share a mutual interest in preserving and enhancing your and our long-term business relationship, and your possible success as an Slender Lady Franchisee, which will benefit you, us and other members of the Slender Lady system, and you and we believe that it's important that any possible business problems be addressed and successfully resolved as soon as possible, and since this Agreement and various laws (as applicable) require us to give you notice of, and opportunity to cure, various claimed defaults, it is only fair, and you and we agree, that:

(a)    Prior to you taking any legal or other action against us and/or any of the Franchisor-Related Persons/Entities, whether for arbitration, damages, injunctive, equitable or other relief (including, but not limited to, rescission) and whether by way of claim, counterclaim, cross-complaint, raised as an affirmative defense, offset or otherwise, you will first give us sixty (60) days prior written notice and opportunity to cure such alleged act or omission [or, if such alleged act or omission cannot reasonably be cured within such sixty (60) day period, and we are diligently continuing efforts to attempt to cure such alleged act or omission, such additional time as we are continuing such efforts]; provided that any dispute regarding our withholding consent with respect to a proposed transfer by you may be immediately submitted to face-to-face meeting, mediation and arbitration as provided in Section 20.1; and (in addition)

(b)    If you have any complaint regarding our failing to perform any obligation to you (whether arising under this Agreement or otherwise, including, but not limited to, training, marketing, operational support, representations by us or otherwise) you will promptly advise us in writing of such complaint within 90 days of the problem arising, so that we can have an opportunity to correct the problem.

If you fail to comply with any portion of this Section, then, notwithstanding any provision in this Agreement or otherwise, you'll be forever precluded from taking any legal or other action against us and/or any of the Franchisor-Related Persons/Entities, whether for arbitration, damages, injunctive, equitable or other relief (including, but not limited to, rescission) and whether by way of claim, counterclaim, cross-complaint, raised as an affirmative defense, offset or otherwise, with regard to the matter.

### 20.4    Periods In Which to Make Claims.

(a)    No arbitration, action or suit (whether by way of claim, counterclaim, cross-complaint, raised as an affirmative defense, offset or otherwise) by either you or us will lie or be permitted against the other (nor by you against any of the Franchisor-Related Persons/Entities), whether for damages, rescission, injunctive or any other legal and/or equitable relief, in respect of any alleged breach of this Agreement, or any other claim of any type, unless such party will have commenced such arbitration proceeding, action or suit before the expiration of the earlier of:

(1)    One (1) year after the date on which the state of facts giving rise to the cause of action comes to the attention of, or should reasonably have come to the attention of, such party; or

(2)    One (1) year after the initial occurrence of any act or omission giving rise to the cause of action, whenever discovered.

(b)    Notwithstanding the foregoing limitations, where any federal, state or provincial law provides for a shorter limitation period than above described, whether on notice or otherwise, such shorter period will govern.

(c)    The foregoing limitations may, where brought into effect by our failure to commence an action within the time periods specified, operate to exclude our right to sue for damages but will in no case, even on expiration or lapse of the periods specified or referenced above, operate to prevent us from (i) terminating your rights and our obligations under this Agreement as provided herein and/or under applicable law nor prevent us from obtaining any appropriate court judgment, order or otherwise which enforces and/or is otherwise consistent with such termination or (ii) obtaining and/or enforcing a temporary restraining order, preliminary injunction, permanent injunction or other equitable relief (whether by an arbitrator or a court) with respect to any operational noncompliance by you, irrespective of when such operational noncompliance occurred or came to our attention, in each case you agreeing that such relief is appropriate so that we can, among other things, protect the goodwill inherent in the Marks and the related investments by us and all other Slender Lady Franchisees.

(d)    The limitations set forth in subsections (a) and (b) will not apply to our claims arising from or related to: (1) indemnification by you; (2) your confidentiality, non-competition or other exclusive relationship obligations; and/or (3) your unauthorized use of the Marks.

### 20.5    Withholding Consent.    In no event will you make any claim, whether directly, by way of set-off, counter-claim, defense or otherwise, for money damages or otherwise, by reason of any withholding or delaying of any consent or approval by us. Your sole remedy for any such claim is to submit it to an executive meeting, mediation and arbitration as described in this Agreement and for the arbitrator to order us to grant such consent. Unless otherwise expressly provided in this Agreement, we may withhold approvals and consents in our sole and absolute discretion.

### 20.6    Survival and Construction.    Each provision of this Article 20, together with the provisions of Article 15, will be deemed to be self-executing and continue in full force and effect subsequent to and notwithstanding the expiration, termination, setting aside, cancellation, rescission, unenforceability or otherwise of this Agreement (or any part of it) for any reason, will survive and will

govern any claim for rescission or otherwise and will apply to and govern any claim against, or with respect to, the Marketing Fund.

Your ~and our~ non-competition and confidentiality obligations shall survive the expiration and/or termination of this Agreement according to their terms, and your ~and our~ indemnity obligations shall forever survive. You hereby waive the effect of any statute of limitation, which would, by lapse of time, limit your ~and our~ obligations to ~and we~ observe such obligations and/or so defend and/or indemnify and/or hold harmless.

Each provision of this Agreement will be construed as independent of, and severable from, every other provision and if any provisions are deemed to be unenforceable in any way, such provisions will be modified or interpreted to the minimum extent necessary to have them comply with the law (including making such provision mutual in effect) and the remaining provisions of this Agreement will remain in full force and effect, the parties agreeing that the unenforceability of any provisions of this Agreement will not affect the remainder of this Agreement, notwithstanding any statutory or decisional law to the contrary.

Each party reserves the right to challenge any law, rule or judicial or other construction which would have the effect of varying or rendering ineffective any provision of this Agreement. The benefits and protections of this Agreement which apply to us (including, but not limited to, indemnification and/or releases) shall also apply to any past, current and/or future Franchisor-Related Persons/Entities. In each case where we may exercise any option or other right, we may do so in our sole and absolute discretion, without liability or other obligation. We may, in our sole and absolute discretion, elect to not enforce (or to selectively enforce) any provision of this Agreement, or any other agreement, any policy or otherwise, whether with respect to you and/or any other franchisee or otherwise, and we may apply different policies to any franchisee, all without liability or other obligation and any such acts or omissions will not limit or otherwise affect our rights, whether to strictly enforce this Agreement or otherwise. *IF COUNTER TO ANY CURRENT OR FUTURE FEDERAL, STATE AND/OR LOCAL LAW,*

**20.7    Costs and Attorneys' Fees.**  Except as expressly provided otherwise in this Agreement with respect to appeal of an arbitration award, or with respect to our rights to recover attorneys' fees in connection with our indemnification rights hereunder, or as otherwise expressly provided in this Agreement, and based on your and our judgment that attorney's fees provisions often operate to primarily benefit the attorneys involved in any claim and/or to encourage specious claims to the detriment of everyone involved in a franchise system, the parties will each bear their own costs of enforcement and/or defense (including but not limited to attorney's fees) in any claim or dispute between you and us (including any claim by you, or on your behalf, against the Franchisor-Related Persons/Entities or otherwise) and will make no claim with regard thereto.

**20.8    Validity and Execution.**  This Agreement will become valid only when executed and accepted by us at our headquarters.

**20.9    Binding Effect, Modification and Representations.**  This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns, and successors in interest, and will not be modified or supplemented except by means of a written agreement signed by both you and our President or Chief Executive Officer, provided that changes to the Manuals may be made by us at any time and will be fully binding on you notwithstanding any provisions of this section or otherwise. No other officer, field representative, salesperson or other person has the right or authority to sign on behalf of us, to make oral or written modifications to this Agreement, or to make any representations or agreements on behalf of us, and any such modifications, representations and/or agreements shall not be binding on us. You expressly acknowledge that no oral promises, representations or declarations were made to or relied on by you and that our obligations are confined exclusively to the terms herein. You understand and assume the business risks inherent in the franchised enterprise.

**20.10    Construction, etc.**  Except as expressly provided otherwise, nothing in this Agreement is intended, nor will be deemed, to confer any rights or remedies on any person or legal entity not a party

hereto. We have the absolutely unrestricted right to condition, withhold and/or refuse, in our sole and absolute discretion, any request by you and our approval of, or consent to, any action or omission by you. The headings of the several Articles and Sections hereof are for convenience only and do not define, limit, or construe the contents of such Articles or Sections. The term "attorneys' fees" includes all legal fees, whether incurred prior to, in preparation for or in contemplation of the filing of any written demand or claim, action, hearing or proceeding to enforce the obligations of this Agreement. References to a "controlling interest" in the Franchisee include, without limitation, fifty percent (50%) or more of the voting control of the Franchisee if the Franchisee is a corporation, and any general partnership interest if the Franchisee is a partnership. The term "you" is applicable to one or more persons, a corporation or a partnership, as the case may be. The singular usage includes the plural and the masculine and neuter usages include the other and the feminine. If two or more persons are at any time the Franchisee hereunder, their obligations and liabilities will be joint and several. This Agreement will be executed in multiple copies, each of which will be deemed an original. Each of the provisions of this Agreement (including Articles 15 and 20) applies to any claim brought (or which could be brought) by any owner and/or affiliate of yours or by or on your behalf. If any limitation on your rights is held unenforceable with respect to you, then such limitation will not apply to us. We shall have the sole right to enforce the obligations of this (or any other) Franchise (or other) Agreement and neither you nor any other franchisee of ours shall be deemed a third party beneficiary with respect to this or any other agreement.

You and we, each believing that (1) having written documents as the only basis for our legal relationship benefits each of us equally and reduces the risk of uncertainty in what should be a long-term business relationship and (2) this Agreement should be strictly interpreted according to its express terms, and each of us having a concern with (among other things) an approach whereby a court or arbitrator might impose (or limit or expand) duties on either of us that were not expressly agreed to in writing by you and us, agree that you and we mutually and expressly waive any "implied covenant of good faith and fair dealing," similar doctrine, rule of interpretation or otherwise and that no such (or similar) doctrine, rule of interpretation or otherwise will have any application to your and our relationship, this Agreement or any other agreement between you and us (or any affiliate or the Franchisor-Related Persons/Entities) nor will affect our ability to make binding changes to the Slender Lady System, the Manual(s) or otherwise. Neither you nor we have any expectation or agreement that your or our rights and obligations will be otherwise than as expressly set forth in this Agreement or that where any contractual provision allows you or us any discretion in action or otherwise, the exercise of that discretion will be limited in any way, whether by any "implied covenant of good faith and fair dealing," any similar doctrine or rule of interpretation or otherwise. No course of dealing between you and us, nor any course of dealing or agreement between us and anyone else, past, present or future, will affect your or our rights under this Agreement or otherwise. When we use the phrase "sole and absolute discretion" (or any similar phrase or concept), whether in this Agreement or otherwise, you agree that there will be absolutely no limitation (including, but not limited to, any "implied covenant of good faith and fair dealing" or otherwise) on our completely unrestrained ability and right to exercise that discretion in any way we choose.

If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of, or refusal to renew, this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by us is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and we will have the right, in our sole and absolute discretion, to modify such invalid or unenforceable provision, specification, standard, or operating procedure to the extent required to be valid and enforceable. You agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any specification, standard or operating procedure prescribed by us, any portion or portions which a court may hold to be unenforceable in a final decision to which we are a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Such modifications to this Agreement shall be effective only

in such jurisdiction, unless we elect to give them greater applicability, and this Agreement shall be enforced as originally made and entered into in all other jurisdictions.

You will have no right to enforce any obligation of ours or any other person/entity (including, but not limited to, any other Slender Lady Franchisee) under, and you will not be deemed a third party beneficiary of, any other Franchise Agreement, other agreement or otherwise. You agree that neither we (nor any of the Franchisor-Related Persons/Entities) will be liable for any act or omission which is consistent with this Agreement or other information provided to you, or which is done in subjective good faith.

**20.11    Non-Retention of Funds.** You do not have the right to offset or withhold payments owed to us (and/or any affiliate) for amounts purportedly due you (or any affiliate of yours) from us, the Franchisor-Related Entities and/or any affiliate as a result of any dispute of any nature or otherwise, but will pay such amounts to us (or our affiliate) and only thereafter seek reimbursement in accordance with the provisions of Article 20. If you believe that we or any other person/entity has violated any legal duty to you, you will, notwithstanding such dispute, pay as designated all sums specified under this Agreement or any other agreement, whether to be paid to us or the Franchisor-Related Persons/Entities (including Royalty Fees, any unpaid portion of the initial franchise fee, any marketing contributions and/or amounts payable to franchisee councils and/or cooperatives, rent or otherwise) and will not withhold any payments until and unless such dispute has been finally determined in your favor.

**20.12    Severability; Substitution of Valid Provisions.** Except as otherwise stated in this Agreement, each provision of this Agreement, and any portion of any provision, is severable (including, but not limited to, any provision affecting any rights to recovery for breach of any legal obligation, including but not limited to waiver of statutory benefits such as rights to jury trial, exemplary or punitive damages, recovery of attorney's fees and/or statutes of limitations), and the remainder of this Agreement will continue in full force and effect. To the extent that any provision restricting your competitive activities is deemed unenforceable, you and we agree that such provisions will be enforced to the fullest extent permissible under governing law. This Agreement will be deemed automatically modified to comply with governing law if such law requires: (a) a greater time period for notice of the termination of, or refusal to renew, this Agreement; or (b) the taking of some other action not described in this Agreement. We may modify any invalid or unenforceable provision to the extent required to be valid and enforceable and the modified provisions will bind you.

**20.13    Waivers.** Our waiver of any breach(es) under this or any other agreement [whether by failure to exercise a power or right available to us, failure to insist on strict compliance with the terms, obligations or conditions of any agreement, development of a custom or practice between you and us (or others) which is at variance with the terms of any agreement, acceptance of partial or other payments or otherwise], whether with respect to you or others, will not affect our rights with regard to any breach by you or anyone else or constitute a waiver of our right to demand exact compliance by you with the terms of this Agreement or otherwise. Subsequent or other acceptance by us of any payments or performance by you will not be deemed a waiver of any preceding or other breach by you of this Agreement or otherwise. The rights and remedies provided in this Agreement are cumulative and we will not be prohibited from exercising any rights or remedies provided under this Agreement or permitted under law or equity.

**20.14    Choice of Laws.** You and we, both agreeing on the practical business importance of certainty as to the law applicable to your and our relationship and its possible effect on the development and competitive position of the Slender Lady System, jointly agree that, except with respect to the applicability of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and the effect of federal preemption of state law by such Act and except to the extent governed by the United States Trademark Act and other federal laws or as provided elsewhere in this Agreement, this Agreement (including any claims, counter-claims or otherwise by you and/or any affiliate of yours) and all other matters concerning you (and/or any affiliate of yours) and us (and/or any affiliate of ours), and/or you (and/or any affiliate of yours) and any of

the Franchisor-Related Persons/Entities, including your/our/their respective rights and obligations, will be governed by, and construed and enforced in accordance with, the laws of the state of Texas (where we are currently headquartered), without regard to the laws of such state relating to conflicts of laws or choice of law, except that the provisions of any law of that state regarding franchises (including, without limitation, registration, disclosure, or relationship, and the regulations thereunder) shall not apply unless such state's jurisdictional, definitional and other requirements are met independently of, and without reference to, this section.

### 21.    COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument.

### 22.    EXHIBITS

The Exhibits, attached hereto, are incorporated herein and made a part hereof as if set forth herein in full.

IN WITNESS WHEREOF, the parties to this Agreement have caused it to be executed on the dates written below.

FRANCHISOR:                                    FRANCHISEE (Individual)

Slender Lady, Inc.
a Delaware corporation                         _____
                                               Printed Name

                                               _____
                                               Signature

By: _____
                                               _____
Title: _____           Printed Name

                                               _____
                                               Signature

FRANCHISEE (Corp., LLC or Partnership)

SNOWTREE ENTERPRISES
Legal Name of Franchisee Entity

a MASSACHUSETTS                    LIMITED LIABILITY COMPANY
Jurisdiction of Formation          Corporation, LLC or Partnership

By: ___JOHN    BLADON___
      Name

Signature

Title: PRESIDENT   AND   CEO

**EXHIBIT 2.2**

**TERRITORY**

The "Territory" is as follows:

_____ *SEE   ATTACHED   PAGES* _____

_____

_____

_____

Note:  Boundary lines include only the area <u>within</u> the boundary line and extend only to the middle of the boundary demarcation (for example, only to the <u>middle</u> of a street or highway.) You have <u>no rights</u> under this Agreement or otherwise with respect to a facility on the other side of the boundary line, street or highway or otherwise, and no matter how close to such boundary a facility may be, regardless of the distance from, impact on, or vicinity of, your Slender Lady Center or the number of Slender Lady Centers, other outlets or otherwise in any area or market.

Your Initials: _____ / _____

## OWNER'S GUARANTY AND ASSUMPTION OF
## CORPORATE FRANCHISEE'S OBLIGATIONS

In consideration of, and as an inducement to, the execution by Slender Lady, Inc., a Delaware corporation, ("Franchisor") of the franchise agreement of even date herewith (the "Agreement") between Franchisor and _SNOWTREE ENTERPRISES_, a(n) ____LLC____ corporation (the "Corporate Franchisee"), each of the undersigned hereby personally and unconditionally, jointly and severally: (1) guarantees to Franchisor, its affiliates, the Franchisor-Related Persons/Entities (as defined in the Agreement) and each of their successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that the undersigned will be bound by, and punctually pay and perform, each and every undertaking, agreement and covenant set forth in the Agreement; (2) agrees to be personally bound by, and personally liable for, the breach of each and every provision in the Agreement; and (3) agrees to be personally bound by, and personally liable for each obligation of the Corporate Franchisee to Franchisor and/or any company affiliated or related in any way with or to Franchisor, including all past, current and/or future obligations of the Corporate Franchisee, the undersigned intending that this guarantee be unqualifiedly general and without limitation in scope, nature and/or effect. Franchisor (and/or its affiliates) need not bring suit first against the undersigned in order to enforce this guarantee and may enforce this guarantee against any or all of the undersigned as it chooses in its sole and absolute discretion.

Each of the undersigned waives:

(1)    acceptance and notice of acceptance by Franchisor, of the foregoing undertakings;

(2)    notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed;

(3)    protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed;

(4)    any right the undersigned may have to require that an action be brought against Franchisor, Corporate Franchisee or any other person as a condition of liability; and

(5)    any and all other notices and legal or equitable defenses to which he or she may be entitled.

Each of the undersigned consents and agrees that:

(1)    his or her direct and immediate liability under this guaranty will be joint and several;

(2)    he and/or she will render any payment or performance required under the Agreement on demand if the Corporate Franchisee fails or refuses to do so punctually;

(3)    such liability will not be contingent or conditioned on pursuit by Franchisor of any remedies against the Corporate Franchisee or any other person;

(4)    such liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time to time grant to the Corporate Franchisee or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this guaranty, which will be continuing and irrevocable during the term of the Agreement;

(5)    the liabilities and obligations of the undersigned, whether under this document or otherwise, will not be diminished or otherwise affected by the termination, rescission, expiration or otherwise of the Agreement; and

(6)    the provisions of Articles 15 and 20 of the Agreement are incorporated in and will apply to this document as if fully set forth herein and shall apply to any dispute involving the Franchisor and any of the undersigned.

In connection with such guarantee and the Franchisor (a) not requiring that the Franchise be initially awarded in the name of one or more of the Guarantors and/or (b) not requiring the payment of a full transfer fee in connection with any related transfer from the undersigned to the Corporate Franchisee, each of the undersigned hereby grants a general release of any and all claims, liabilities and/or obligations of any nature whatsoever, however arising, <u>known or unknown</u>, against the Franchisor and/or any or all of the Franchisor-Related Persons/Entities.

IN WITNESS WHEREOF, each of the undersigned has here unto affixed his or her signature on the same day and year as the Agreement was executed.

GUARANTOR(S)

PERCENTAGE OF OWNERSHIP
OF CORPORATE FRANCHISEE

_____    _____ %

_____    _____ %

_____    _____ %

_____    _____ %

Corporate Franchisee:

SNOWTREE ENTERPRISES, a ~~MASSACHUSETTS corporation.~~ LIMITED LIABILITY COMPANY

By _[signature]_

Its   PRESIDENT AND CEO

Franchise Agreement Number: _____

THE CORPORATE FRANCHISEE AGREES TO TAKE RESPONSIBILITY FOR PAYMENT OF THE MONTHLY ROYALTY FEE TO SLENDER LADY INC FOR EACH LICENSED FRANCHISE STORE. THIS AGREEMENT WILL CONTINUE IN EFFECT UNTIL SUCH TIME AS A NEW OWNER OR TRANSFEREE, INCLUDING SLENDER LADY INC, IS IN A LEGAL POSITION TO TAKE RESPONSIBILITY FOR THE MONTHLY ROYALTY FEE.

**Current Form of**
**Slender Lady, Inc. Releasing Language**
**(subject to change)**

Release-General Provisions.  The Franchisee(s), jointly and severally, hereby release and forever discharge each and all of the Franchisor-Related Persons/Entities (as defined below) of and from any and all causes of action, in law or in equity, suits, debts, liens, defaults under contracts, leases, agreements or promises, liabilities, claims, demands, damages, losses, costs or expenses, of any nature whatsoever, howsoever arising, **known or unknown**, fixed or contingent, past or present, that the Franchisee(s) (or any of them) now has or may hereafter have against all or any of the Franchisor-Related Persons/Entities by reason of any matter, cause or thing whatsoever from the beginning of time to the date hereof (the "Claims"), it being the mutual intention of the parties that this release be unqualifiedly general in scope and effect and that any Claims against any of the Franchisor-Related Persons/Entities are hereby forever canceled and forgiven.

THE FRANCHISEE(S) ACKNOWLEDGE THAT THEY ARE FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

THE FRANCHISEE(S), BEING AWARE OF THIS CODE SECTION, HEREBY EXPRESSLY WAIVE ALL OF THEIR RIGHTS THEREUNDER AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT OF ANY APPLICABLE JURISDICTION, INCLUDING, WITHOUT LIMITATION, CALIFORNIA AND/OR [JURISDICTIONS OF FRANCHISEE(S)' RESIDENCE AND LOCATION OF FRANCHISED UNITS].

The Franchisee(s) expressly assume the risk of any mistake of fact or fact of which they may be unaware or that the true facts may be other than any facts now known or believed to exist by Franchisee(s), and it is the Franchisee(s) intention to forever settle, adjust and compromise any and all present and/or future disputes with respect to all matters from the beginning of time to the date of this document finally and forever and without regard to who may or may not have been correct in their understanding of the facts, law or otherwise.  All releases given by the Franchisee(s) are intended to constitute a full, complete, unconditional and immediate substitution for any and all rights, claims, demands and causes of action whatsoever which exist, or might have existed, on the date of this document.  The Franchisee(s) represent and warrant that they have made such independent investigation of the facts, law and otherwise pertaining to all matters discussed, referred to or released in or by this document as the Franchisee(s), in the Franchisee(s) independent judgment, believe necessary or appropriate.  The Franchisee(s) have not relied on any statement, promise, representation or otherwise, whether of fact, law or otherwise, or lack of disclosure of any fact, law or otherwise, by the Franchisor-Related Persons/Entities or anyone else, not expressly set forth herein, in executing this document and/or the related releases.

Franchisee(s) Initials: _____

No Assignment or Transfer of Interest.  The Franchisee(s) represent and warrant that there has been, and there will be, no assignment or other transfer of any interest in any Claims that the Franchisee(s) may have against any or all of the Franchisor-Related Persons/Entities, all Claims having been fully and finally extinguished, and the Franchisee(s) agree to forever indemnify and hold the Franchisor-Related Persons/Entities harmless from any liability, claims, demands, damages, losses, costs, expenses or attorneys' fees incurred by any of the Franchisor-Related Persons/Entities as a result of any person asserting any interest in any of the Claims and/or any voluntary, involuntary or other assignment or transfer, or any rights or claims under any assignment, transfer or otherwise.  It is the intention of the parties that this indemnity does not require payment by any of the Franchisor-Related Persons/Entities as a condition precedent to recovery against the Franchisee(s) under this indemnity.

Franchisee(s) Initials: _____

Attorneys Fees.  If the Franchisee(s), or anyone acting for, or on behalf of, the Franchisee(s) or claiming to have received, by assignment or otherwise, any interest in any of the Claims, commence, join in, or in any manner seek relief through any suit (or otherwise arising out of, based upon or relating to any of the Claims released hereunder or in any manner asserts against all or any of the Franchisor-Related Persons/Entities any of the Claims released hereunder, the Franchisee(s) agree to pay all attorneys' fees and other costs incurred by any of the Franchisor-Related Persons/Entities in defending or otherwise responding to said suit or assertion directly to the Franchisor-Related Persons/Entities incurring such costs.

Franchisee(s) Initials: _____

"Franchisor-Related Persons/Entities."  Slender Lady, Inc., together with each of its past, current and future: predecessors, successors, partners, shareholders, officers, directors, agents, attorneys, accountants, and/or employees and/or any affiliated companies and/or persons, and each of their respective partners, shareholders, officers, directors, agents, attorneys, accountants, and/or employees, as well as any company(ies)/person(s) acting by, through, under, in concert and/or affiliated/associated in any way with any of the foregoing.

Franchisee(s) Initials: _____

Date of Releases, Joint and Several Liability.  The releases granted hereunder shall be deemed effective as of both the date hereof and the date of any transfer of the Franchise and/or the Franchise Agreement and/or any termination of the Franchise and/or the Franchise Agreement.  The liabilities and obligations of each of the Franchisee(s) (and any other person/entity providing releases to the Franchisor-Related Persons/Entities) shall be joint and several.

Franchisee(s) Initials: _____



# snow tree
## ENTERPRISES LLC

4 Winthrop Place
Wayland, MA 01778
(508) 358-0769

July 21, 2003

Designated territory for Snowtree Enterprises:

Route 93 North through Boston to Route 495.
Route 495 South to the Atlantic Ocean at the Bourne Bridge.
North along the shoreline to Cohasset.
West to join Route 93 in Braintree.

**Inclusions:**
Hyannis *and Cape Cod*
Upton
Milford
Bellingham
Westford

**Exclusions:**           *Attleboro*
Boston                    *Hopkinton*
Cambridge                 *Foxboro*
Framingham
Shrewsbury
Marlborough
Northborough



snow tree
ENTERPRISES LLC

*John Bladon*
President and
Chief Executive Officer

(508) 358-0769
4 Winthrop Place
Wayland, MA 01778

TERRITORY AGREEMENT V4

PAGE 2 EXHIBIT 2.2

8)

**xx** CAUSE: FIRST RIGHT OF REFUSAL

TERM: 7/19/03 → 2/1/05

WHERE: THAT GEOGRAPHIC AREA DESIGNATED ON ATTACHED MAP AND DEMARKED WITH DIAGONAL LINES GENERALLY CONSIDERED TO BE MASSACHUSETTS EAST OF I-495 AND EXCLUSIONARY AREAS AS SO NOTED AND SPECIFICALLY FRAMINGHAM, MASS.

PROTOCOL: SHOULD S.L., INC RECEIVE INQUIRIES FROM PROSPECTIVE PARTIES WITHIN SAID FOREMENTIONED TERRITORY SL, INC WILL <u>BEFORE</u> CONSUMMATING ANY CONTRACT FOR A SPECIFIC CITY, TOWN, ETC. IN SAID AREA CONTACT FRANCHISEE TO DETERMINE WHETHER OR NOT FRANCHISEE HAS INTEREST IN SAID AREA OR NOT. IF YES, FRANCHISEE MAY ASSIGN 1-8 OF THE INSTANT STORES AS BEING BUILT THERE AND/OR UTILIZE THE DEPOSIT MONEY FOR 5-8 TO HOLD SAID AREA OR RELINQUISH AREA TO S.L. INC FOR DEVELOPMENT TO ANOTHER PARTY. ALL STORE LOCATIONS ASSIGNED TO THIS FIRST RIGHT OF REFUSAL BASIS MUST BE SECURED WITH A MINIMUM $5,600 DEPOSIT AND THE BALANCE OF $19,900. PAID TO S.L., INC NO LATER THAN SIX MONTHS THEREAFTER. S.L. INC AND FRANCHISEE WILL COOPERATIVELY COMMUNICATE EACH OTHERS INTENT TO DEVELOP SAID AREA AND NOT UNREASONABLY WITHOLD

CONT: 8

NOTIFICATION OF SUCH INTENT. SHOULD FRANCHISEE
DEVELOP STORES WITHIN SAID AREA UP TO THE
NUMBER 25, SAID STORES WILL COST #24,900.ᵒᵒ EVEN
THOUGH IT IS THE INTENT OF FRANCHISOR TO RAISE
FRANCHISE FEE IN THE NEAR FUTURE.

7/19/03

V.P. SALES, S.L. INC

FRANCHISEE                              7/20/03
                                         DATE

# EXHIBIT 2.2
## TERRITORY AGREEMENT V4

TERRITORY: *EASTERN MASSACHUSETTS AS DESIGNATED*

*ON MAP EXHIBIT 2.2*

☆ FRANCHISEE: ~~TBG~~ *SNOWTREE ENTERPRISES LLC*

TERMS: ~~DELIVERED~~ provided the following conditions are met,
*FIRST RIGHT OF REFUSAL*

1) Total store commitment is *EIGHT*

2) Cost for Location #1 is *$29,900.00* with a *$29,900.00*

   deposit paid this date and the balance due of *-0-*

   paid to Slender Lady, Inc. no later than *N/A*

3) Cost for Locations # *2 → 25* is $ *24,900.00* each.

4) Locations # *2, 3, 4* this date will be secured with a

   *$24,900.00* non-refundable deposit on

   EACH location. Balance due on EACH location is payable to Slender Lady,

   Inc. no later than *N/A*

5) Locations # *5, 6, 7, 8* this date will be secured with a

   *$5,000.00* non-refundable deposit on each

   location. Balance due on each location is *$19,900.00*

   payable to Slender Lady, Inc. no later than *FEB 1, 2005*

6) In the event of non-performance, partial performance and/or non-timely
   performance company may at it's sole discretion retain deposit funds for
   each location to the benefit of Slender Lady, Inc. without consideration to
   franchisee. In addition company may at it's sole discretion rescind exclusivity.

7) All locations built, operational and/or paid for will at a minimum have a

   *THREE* mile protected radius from their exact physical address.

☆ _____          DATE *7/20/03*
FRANCHISEE

☆ _____          DATE
FRANCHISEE

_____ *V.P. SALES*          *7/19/03*
FOR: Slender Lady, Inc.   *S.L. Inc*          DATE